# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

LORI ANN SCANLON MARAMANTE,            |
                                        |
            *Plaintiff*,                |        C.A. No.: 1:21-cv-00325-RGA
                                        |
        v.                              |
                                        |
DELAWARE TECHNICAL and                  |
COMMUNITY COLLEGE,                      |
                                        |
            *Defendant*.                |

## PLAINTIFF'S APPENDIX TO ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SCHMITTINGER & RODRIGUEZ, P.A.
William D. Fletcher, Jr., Esquire
Bar I.D. # 362
Gary E. Junge, Esquire
Bar I.D. # 6169
414 South State Street
P.O. Box 497
Dover, Delaware 19903-0497
(302) 674-0140
Attorneys for Plaintiff

Dated: October 17, 2022

## TABLE OF CONTENTS

Page

Excerpts from Deposition of Lori Ann Scanlon Maramante ………………………………….B001

Excerpts from Deposition of Bobbi J. Barends …………………………………………….B019

Excerpts from Deposition of Christy A. Moriarty …………………………………………..B041

Excerpts from Deposition of Linda Collins  ………………………………………………...B056

Excerpts from Deposition of Suzanne M. Mooney-Marsh  ………………………………...B071

Dr. Barends November 11, 2019, memo to Dr. Maramante  ………………………………...B080

Dr. Barends' September 9, 2019, email requesting investigation ……………………………B081

Dr. Barends and Dean Moriarty October emails LM leave of absence ………………………B082

Dr. Maramante August 2017 Evaluation  ……………………………………………………B083

Dr. Maramante January 2018 Evaluation  ……………………………………………………B089

Dr. Maramante August 2018 Evaluation  ……………………………………………………B094

Dr. Maramante September 2019 Evaluation  ………………………………………………...B100

DTCC Personnel Policy Manual  …………………………………………………………….B108

**In the Matter Of:**

*LORI ANN SCANLON MARAMANTE vs*

*DELAWARE TECHNICAL COMMUNITY COLLEGE*

---

*LORI ANN SCANLON MARAMANTE*

*August 05, 2022*

---



1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3

4   LORI ANN SCANLON            )
    MARAMANTE,                  )
5                               )
         Plaintiff,             )
6                               )Civil Action No.
    v.                          )21-00325-RGA
7                               )
    DELAWARE TECHNICAL          )
8   COMMUNITY COLLEGE,          )
                                )
9        Defendant.             )

10

11        Deposition of LORI ANN SCANLON

12    MARAMANTE taken pursuant to notice at

13    the law offices of Young, Conaway,

14    Stargatt & Taylor, LLP, 1000 North King

15    Street, Rodney Square, Wilmington,

16    Delaware, beginning at 10:05 a.m., on

17    Friday, August 5, 2022, before Kurt A.

18    Fetzer, Registered Diplomate Reporter

19    and Notary Public.

20

21          LEXITAS REPORTING
22    Registered Professional Reporters
          1330 King Street
23      Wilmington, Delaware 19801
          (302) 655-0477
24        www.lexitaslegal.com

Lori Ann Scanlon Maramante - August 05, 2022

```
                                                              2
 1   APPEARANCES:

 2        GARY E. JUNGE, ESQ.
          SCHMITTINGER & RODRIGUEZ, P.A.
 3          414 South State Street
            Dover, Delaware  19901
 4          For the Plaintiff

 5        LAUREN E.M. RUSSELL, ESQ.
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
 6          1000 North King Street

 7   ALSO PRESENT:
          DARRYL A. PARSON, ESQ.
 8        DEBORAH COLES, PARALEGAL

 9              -   -   -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Lori Ann Scanlon Maramante - August 05, 2022

3

1          LORI ANN SCANLON MARAMANTE,

2     the deponent herein, having first

3     been duly sworn on oath, was

4     examined and testified as follows:

5               EXAMINATION

6 BY MS. RUSSELL:

7   Q.   Would you mind stating your name

8 and address for the record, please?

9   A.   Yes.  Lori Ann Scanlon

10 Maramante, 73 Sioux Drive, Millsboro,

11 Delaware, 19966.

12   Q.   This is the first time in a long

13 time I've done this in person so you'll

14 have to bear with me as I sort of get

15 my sea legs again.

16           So we're here today to take

17 your deposition in a lawsuit that you

18 filed against Delaware Technical

19 Community College.

20           Do you understand that?

21   A.   Yes.

22   Q.   At various times through the

23 deposition I may refer to the defendant

24 as Del Tech or DTCC.  When I use those

Lori Ann Scanlon Maramante - August 05, 2022

37

1    here?

2       A.    No.

3       Q.    And you mentioned then you moved

4    on to Delaware Tech.  And at the top of

5    your professional experience here you

6    list a role as program manager, Upward

7    Bound Math & Science Center.

8                 Is that the position that

9    you were just referring to?

10      A.    Yes, it is.

11      Q.    Was that a full-time position

12   with Del Tech?

13      A.    Yes.

14      Q.    And you accepted it in August of

15   2004?

16      A.    Yes.

17      Q.    Did you experience any treatment

18   that you believed to be unlawful during

19   your employment at El Camino Community

20   College?

21      A.    No.

22      Q.    Did you experience any treatment

23   that you believed to be unlawful during

24   your employment with the Los Angeles

Lori Ann Scanlon Maramante - August 05, 2022

50

1    Q.    And that's your signature next

2    to the date?

3    A.    Yes.

4    Q.    Is this your application for the

5    science faculty position?

6    A.    It appears to be.

7    Q.    I know I'm asking you to guess

8    based on a date.  There's nothing on

9    here at least as it appears to me that

10   identifies the specific job.

11            Is that right?

12   A.    What's the question?

13   Q.    I said I don't see anything on

14   here that identifies a specific job.

15   Oh, I apologize.  I do.  I'm fibbing.

16            So if you look a third of

17   the way down on the first page under

18   position title applied for it says

19   "Science Instructor (10 month)."

20            Do you see that?

21   A.    Yes.

22   Q.    Does that help refresh your

23   recollection as to what this relates

24   to?

Lori Ann Scanlon Maramante - August 05, 2022

51

1    A.    Yes.

2    Q.    And did you submit a resume at

3  the same time as you submitted this

4  application?

5    A.    Probably.  I don't know.

6    Q.    I'm just asking because I'm

7  wondering if Maramante 1 is the resume

8  that would have related to this job

9  application.

10    A.    Probably, because it has the

11  program manager position on it.

12    Q.    So the application is dated

13  February of 2005.  Your resume

14  indicates that you first began with

15  DTCC in August of 2004.

16          So, first, were you

17  ultimately successful in this

18  application?  Were you awarded the

19  position of science instructor?

20    A.    Yes.

21    Q.    So did you hold the role of

22  program manager then from August of

23  2004 until sometime in 2005?

24    A.    Yes.

Lori Ann Scanlon Maramante - August 05, 2022

75

```
 1    Q.    I thought that I saw somewhere
 2  in the records that Mrs. Wiggins' role
 3  was sort of divided when she left.  Is
 4  that right?
 5    A.    Yes.
 6    Q.    Can you explain what happened
 7  there to me, to the best of your
 8  understanding?
 9    A.    Yes.  She was the instructional
10  director because of a number of
11  different programs that she oversaw and
12  the number of staff.  The
13  administration above me decided to
14  separate the medical technology program
15  that was supervised by Linda Collins
16  and make it its own department, so that
17  was taken away.  We had a 12-month
18  faculty position that they were going
19  to also let go when that faculty member
20  retired, So that would change the
21  number of staff.
22            And so there would be fewer
23  programs to manage and the general
24  studies programs and so that's why they
```

Lori Ann Scanlon Maramante - August 05, 2022

76

1   sort of split.

2     Q.    So did Linda Collins become a

3   department chair also?

4     A.    Yes.

5     Q.    And then you became a department

6   chair for the remaining programs that

7   had previously been supervised by

8   Mrs. Wiggins?

9     A.    Yes.

10     Q.    So were you and Linda Collins

11   peers essentially?

12     A.    Yes.

13     Q.    When you were promoted to

14   department chair, were you informed of

15   the general expectations for your

16   performance in that role?

17     A.    Yes.

18     Q.    How were you informed?

19     A.    I had a copy of the detailed job

20   description and a copy of the general

21   timelines for activities of reporting.

22     Q.    So would that have summarized

23   sort of the general deadlines that

24   applied to getting ready for each

Lori Ann Scanlon Maramante - August 05, 2022

85

```
1    technicians function?  Did they report

2    directly to you or was there sort of an

3    intermediate in between?

4      A.    Directly to me.

5      Q.    And I've seen the name Dr.

6    Michael Buoni?

7      A.    Buoni.

8      Q.    Buoni?  Okay.  It's B-u-o-n-i?

9      A.    Mm-hmm.

10     Q.    Okay.  I would not have guessed

11   that pronunciation.

12               And was he part of the

13   science department as well?

14     A.    Yes.

15     Q.    Did he come at a later time or

16   where did he fit?

17     A.    He was one of the faculty

18   members.

19     Q.    Oh, okay.  Apologies.  I didn't

20   realize that.

21               So at the end of the day I

22   think you said you're ultimately

23   responsible for the functioning of the

24   entire science department as the chair.
```

Lori Ann Scanlon Maramante - August 05, 2022

94

1    A.    Approximately.

2    Q.    After that how often would you

3    meet with Dean Moriarty?

4    A.    Intermittently as needed.  So we

5    interacted frequently.  We had regular

6    staff meetings with the other

7    departments, department chair meetings

8    and individually probably still every

9    month or six weeks depending on what

10    was going on.

11    Q.    You mentioned that when you

12    pursued the department chair position

13    you submitted a letter of interest.  Is

14    that right?

15    A.    Yes.

16    Q.    Before you submitted that letter

17    of interest, did you talk with any of

18    the folks in the science department

19    about your intent to apply?

20    A.    I'm not sure if I talked to them

21    before I wrote the letter.

22    Q.    Did you have any communications

23    with Dr. Buoni about your intent to

24    apply for the department chair

Lori Ann Scanlon Maramante - August 05, 2022

95

1    position?

2       A.    I did talk to Dr. Buoni and to

3    other staff before I accepted the

4    position.  I'm not sure when in the

5    timeline it was, but I did have a

6    conversation with folks.

7       Q.    Okay. Did --

8       A.    He was part of it.

9       Q.    I apologize.  I didn't mean to

10   cut you off.

11            Did Dr. Buoni express any

12   concerns to you about your service or

13   your prospective service as department

14   chair?

15      A.    He did.

16      Q.    What did he say to you?

17      A.    He said that the only concern

18   that he had was my son's health issues

19   and how it might impact my service.

20      Q.    Did he specifically reference

21   your son?

22      A.    Yes.

23      Q.    Did anybody else express any

24   concerns about your application for the

Lori Ann Scanlon Maramante - August 05, 2022

96

1    department chair position?

2      A.    Not to me.

3      Q.    Did Dr. Buoni explain what about

4    your son's health issues concerned him?

5      A.    He was concerned about the time

6    that I needed to take care of my son's

7    needs.

8      Q.    So he was concerned about

9    frequent absences from the workplace?

10     A.    That's my understanding or

11   potential absences.

12     Q.    Okay.  Prior to being appointed

13   to the department chair role, had you

14   experienced frequent absences from the

15   workplace?

16     A.    Define "frequent absences."

17   Like do you mean taking leave?

18     Q.    Why don't I ask it this way?

19   How often before you were elevated to

20   department chair would you arrive late

21   to work because of personal

22   obligations?

23     A.    I generally didn't arrive late

24   to work.  I did sometimes have to take

Lori Ann Scanlon Maramante - August 05, 2022

123

1    A.    Mid-September.  I don't remember

2    the date.

3    Q.    And you applied for FMLA leave

4    in October of 2019.  Is that right?

5    A.    Yes.

6    Q.    So you were interviewed by

7    Mr. Shirey before your application for

8    FMLA leave?

9    A.    Yes.

10    Q.    Setting aside the issues that

11    Mr. Shirey was investigating, were you

12    aware of any other concerns regarding

13    your performance as department chair?

14    A.    Regarding my performance?  No,

15    not really.

16    Q.    Were you aware that there was

17    any discontent with your performance by

18    Dean Moriarty or Dr. Barends?

19    A.    No.

20            (Maramante Deposition

21    Exhibit No. 14 was marked for

22    identification.)

23    BY MS. RUSSELL:

24    Q.    This is a document titled Duties

Lori Ann Scanlon Maramante - August 05, 2022

186

1   completed and submitted?

2     A.    Due to a worsening of my son's

3   condition in the fall, I then went and

4   Ms. Dockety was no longer in charge.

5   She had retired and I got the FMLA

6   paperwork from Ms. Bunting.

7     Q.    Okay.  I'm sorry.  And what

8   month was that?  You just mentioned it.

9   It went in one ear and out the other.

10    A.    I talked to Carol Bunting in

11  September, the end of September, I

12  believe it was September 26th, in

13  anticipation of an upcoming doctor's

14  appointment where I was going to

15  discuss my son's situation.

16    Q.    Yes.

17    A.    And then I followed up with the

18  FMLA request.

19    Q.    And that was submitted just

20  before you began leave on October 7th?

21    A.    Yeah.

22    Q.    I'm with you.

23          Ms. Hofstetter records here

24  that you had had a discussion with

Lori Ann Scanlon Maramante - August 05, 2022

187

1   Ms. Marsh in August of 2019 where

2   Ms. Marsh stated it was hard on her

3   when you were away.

4           Do you see that?

5    A.   Yes.

6    Q.   Do you recall that discussion

7   with Ms. Marsh?

8    A.   I do.

9    Q.   Can you explain to me to the

10   best of your recollection what she said

11   to you?

12   A.   Yes.  She asked me to "Please,

13   please do not take any more leave."

14           And I said, "Why?"

15           And she said, "People are

16   talking."

17           I said, "Well, who's

18   talking?  What are they saying?  No one

19   has said anything to me."

20           And she said that it was

21   hard on her and that people were

22   talking about how much I was out of the

23   office.

24           And I said that I couldn't

Lori Ann Scanlon Maramante - August 05, 2022

235

```
1            MR. JUNGE:  I will.
2            MS. RUSSELL:  And see if
3     there's any other communications
4     regarding blood draws with anybody
5     else.
6  BY MS. RUSSELL:
7     Q.   We're going to take a quick look
8     at Maramante 32.  There are only two
9     here.
10           So we've talked a lot about
11    your FMLA leave and I think we
12    identified four periods of leave, 2009,
13    2012, 2016 and 2019.
14           I just want to clarify.  So
15    I think the 2009 leave was for the
16    adoption of a child, correct?
17    A.   Yes.
18    Q.   And that was your son?
19    A.   Son.
20    Q.   The 2012 leave was for the
21    adoption of your daughter?
22    A.   Yes.
23    Q.   And then the 2016 and 2019
24    leaves were related to medical issues
```

Lori Ann Scanlon Maramante - August 05, 2022

236

1    with your son.  Is that right?

2      A.    Yes.

3      Q.    I just wanted to clarify that.

4            And interrogatory 16 looks

5    for income records for the past five

6    years.  And I'll represent to you that

7    you produced copies of your W-2's from

8    the State of Delaware, which I believe

9    reflects your work for Del Tech, which

10   is a public institution?

11     A.    Yes.

12     Q.    So am I correct that in the past

13   five years you have not performed

14   paying work for anybody except for Del

15   Tech?  Is that right?

16     A.    That's correct.

17     Q.    If I go back to your hire by Del

18   Tech in -- what was it?

19     A.    2004.

20     Q.    2004?

21     A.    Yes.

22     Q.    Going back to Maramante 1, have

23   you performed paying work for anyone

24   besides Del Tech since August of 2004?

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4

    LORI ANN SCANLON      )

5   MARAMANTE,          )

                    )

6        Plaintiff,    )

                    )

7   vs.             )  Civil Action No.

                    )  21-325 RGA

8   DELAWARE TECHNICAL    )

   COMMUNITY COLLEGE,     )

9                    )

        Defendant.    )

10

11

12       A deposition of DR. BOBBI J. BARENDS was taken

13  pursuant to notice before Carrie Gold, Court Reporter, in

14  the law offices of Schmittinger & Rodriguez, 414 South

15  State Street, Dover, Delaware, on Tuesday,

16  August 9, 2022, beginning at approximately 9:57 a.m.,

17  there being present:

18

19

20

21

22

        VERITEXT NATIONAL COURT REPORTING COMPANY

23            MID-ATLANTIC REGION

        300 Delaware Avenue, Suite 815

24         Wilmington, DE 19801

           302-571-0510

```
                                                        Page 2
 1      APPEARANCES:
 2                      GARY E. JUNGE, ESQ.
                        Schmittinger & Rodriguez
 3                        414 South State Street
                          Dover, Delaware 19901
 4                        (302) 674-0140
                          gjunge@schmittrod.com
 5                      For the Plaintiff
 6
 7
                        LAUREN MOAK RUSSELL, ESQ.
 8                      Young Conaway Stargatt & Taylor
                          Rodney Square
 9                        1000 North King Street
                          Wilmington, Delaware 19801
10                        (302) 576-3255
                          lrussell@ycst.com
11                      For the Defendant
12
13                      DARRYL A. PARSON, ESQ.
                        Delaware Technical Community College
14                        100 Campus Drive
                          Dover, Delaware 19904
15                        (302) 888-5293
                          darryl.parson@dtcc.edu
16                      For the Defendant
17
18
19
20
21
22
23
24
```

```
                                               Page 3

 1
                       I N D E X
 2                                              PAGE
 3    TESTIMONY OF DR. BOBBI J. BARENDS.............    4
 4    EXAMINATION BY MR. JUNGE......................    4
 5
 6
 7
 8
 9                    E X H I B I T S
10
      DR. BARENDS            DESCRIPTION          PAGE
11
      Exhibit 1      1/3/2017 Memorandum to Lori    14
12                   Maramante from Dr. Bobbi
                     Barends, DTCC 000267
13    Exhibit 2      Delaware Technical Community    19
                     College Department Chairperson
14                   Evaluation for Lori Maramante,
                     DTCC 000067-72
15    Exhibit 3      Delaware Technical Community    27
                     College Department Chairperson
16                   Evaluation for Lori Maramante,
                     DTCC 000040-47
17    Exhibit 4      Email From Bobbi Barends Dated   47
                     9/9/2019, DTCC 000403
18    Exhibit 5      Delaware Technical Community    69
                     College Memorandum To Lori
19                   Maramante From Dr. Bobbi
                     Barends Dated 11/11/2019, DTCC
20                   000256
21
22
23
24
```

Page 4

```
 1          DR. BOBBI J. BARENDS, having first been duly
 2    sworn according to law, was examined and testified as
 3    follows:
 4                        EXAMINATION
 5    BY MR. JUNGE:
 6          Q.   First question is an easy one:  Have you ever
 7    been deposed before?
 8          A.   I have not.
 9          Q.   Okay.  Lauren probably went over some of the
10    ground rules with you.
11          A.   Yes.
12          Q.   But this is my opportunity to ask you some
13    questions under oath.  I'm just looking for information,
14    no trick questions.  Everything we say will be taken down
15    by the court reporter so it's important that we not talk
16    over each other.  If I ask you a question, please let me
17    finish asking the question before you begin the answer.
18    And if you're answering, I'll try to let you finish
19    answering before I jump in with the next question.  We
20    will break that rule once or twice, and she will yell at
21    us.  It happens.
22                        The other thing, your answers need to be
23    verbal.  She can't take down head nods, and "uh-huh" and
24    "huh-uh" look an awful lot alike on paper so "yes" or
```

DR. BOBBI J. BARENDS

Page 46

1    Dr. Maramante -- many faculty attend that. I should say

2    it's students, faculty, admins are there. We serve our

3    students lunch and really have a great time kicking off

4    the new academic year -- noticed that many faculty were

5    there. After that, I went back to my office. And

6    shortly -- that afternoon, after the picnic, received a

7    phone call from Dean Moriarty that said she had something

8    to share and had some concerns. I don't remember if we

9    talked on the phone or if we met face-to-face, but she

10   shared that Suzanne Marsh had come to her to share that

11   she was having lunch with Lori Maramante. Lori excused

12   herself to say that she was going to meet her husband and

13   her son on campus in the lab because an employee was

14   going to draw blood for a sample to be sent somewhere at

15   the campus. And so that was concerning enough to Suzanne

16   that she shared that with her -- one of her supervisors,

17   and then Christy brought that to my attention.

18        Q.   Okay. So what was the scope of the

19   investigation?

20                  MS. RUSSELL:  Objection. Foundation.

21   You can answer if you know.

22                  THE WITNESS:  What I requested was that

23   there be an investigation into the situation where an

24   employee brought her child, her, you know, underage

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

DR. BOBBI J. BARENDS

Page 47

1    child, small child, to campus to have blood drawn, and

2    that was concerning to me.  I felt like it put the

3    college at risk.  I thought it -- I was just concerned.

4    What if something would have happened to that child?  So

5    lots of other things.  So I talked to our college

6    president, requested the investigation to understand why

7    Lori was bringing her child on campus to have a blood

8    draw by another faculty member.

9    BY MR. JUNGE:

10        Q.    Was the investigation specific to

11   Dr. Maramante or was it a general investigation?

12        A.    It was an investigation based on the situation

13   that occurred.  So Brian, our general counsel, conducted

14   the investigation.  I was not a part of it at all, not a

15   part of any meetings or any of the scheduling.  It was

16   an, I would say, independent investigation away from me.

17   I requested it, and I was waiting for recommendations.

18        Q.    I guess back to my question:  What did you

19   specifically ask Mr. Shirey and Ms. Beaty --

20        A.    I asked them to investigate the situation

21   where Lori allegedly -- because, you know -- brought her

22   son to campus to have blood drawn.

23        Q.    Okay.

24                    (A document was marked as Dr. Barends

DR. BOBBI J. BARENDS

Page 48

1    Exhibit 4 for identification.)

2    BY MR. JUNGE:

3         Q.   So this isn't a got-you moment.  I realize

4    this is three years ago and memories aren't perfect.  But

5    is this an email --

6         A.   Yeah.

7         Q.   -- from you to the people doing the

8    investigation?

9         A.   Yes.

10        Q.   And it asks them to investigate blood draws in

11   general, right?

12        A.   Uh-huh.

13        Q.   Did they ever report back to you the results

14   of the investigation?

15        A.   I believe I received an email a couple weeks

16   after that, after Brian's evaluation was -- or

17   investigation -- I'm sorry -- was completed, and he

18   shared that his investigation was completed, and he would

19   like to have a conversation with myself and Dr. Beaty,

20   which we did.  And based on what he shared with me around

21   that there was, indeed, an attempt to do a blood draw

22   and, you know, per his findings, there was several other

23   times when Lori brought her child to campus for blood

24   draws.  I then, at that time, with their assistance, made

DR. BOBBI J. BARENDS

Page 49

1    the decision to move forward with removing Lori from her

2    role.

3        Q.   Okay.  Before we get there, was there any type

4    of formal finding by them?  Did they write you a letter?

5        A.   I did not have a letter.

6        Q.   Okay.  Did they supply you with any documents

7    supporting any of the allegations being investigated?

8        A.   I did not receive any files from the

9    investigation.

10       Q.   Did they ask if anyone else had received blood

11   draws on campus besides Dr. Maramante?

12                MS. RUSSELL:  Objection.  Foundation.

13   You can answer if you know.

14                THE WITNESS:  They didn't ask me that.

15   BY MR. JUNGE:

16       Q.   You asked them to investigate, though,

17   correct?

18       A.   Right.

19       Q.   Did they report back to you that anyone else

20   on the campus had requested blood draws --

21       A.   No.

22       Q.   -- or had blood draws taken?

23       A.   No.

24       Q.   So as far as you know, Dr. Maramante is the

DR. BOBBI J. BARENDS

Page 50

1    only person who has ever brought a child in or had blood

2    drawn for personal reasons?

3         A.    Yeah, as far as I know.

4         Q.    Do you know how many times she had blood

5    drawn?

6         A.    I do not.

7         Q.    Do you know what the blood draws were for?

8         A.    I do not specifically.

9         Q.    If they were being used at Del Tech as part of

10    the research program, would that be a personal use?

11        A.    If the -- if a protocol was followed for how

12    that should happen, I wouldn't have a concern about that.

13        Q.    Okay.  Let me ask this:  Who was doing the

14    blood draw?

15        A.    The person that I believe was asked to do the

16    blood draw that day was Linda Collins.

17        Q.    Has Linda Collins drawn blood before?

18        A.    She's a medical lab technician so I would

19    imagine -- or technologist.  I would imagine she has.

20        Q.    Actually that was a poor question.

21              Is Ms. Collins a phlebotomist?

22        A.    I don't know the answer to that.

23        Q.    Okay.  That's fine.  So my poorly-worded

24    question --

DR. BOBBI J. BARENDS

1          A.    She has a degree -- I'm sorry.

2          Q.    Go ahead.

3          A.    She has a degree in medical lab technology.

4     That's all I know.

5          Q.    Okay.  Do you know if she was the one who drew

6     blood for Dr. Maramante or Dr. Maramante's husband or,

7     apparently, the family dog on the previous occasions?

8          A.    I don't know the answer to that.

9          Q.    Okay.  How many times did you hear that blood

10    was drawn for Dr. Maramante?

11         A.    What was shared with me was four times.

12         Q.    Four times.  But you don't know who drew the

13    blood?

14         A.    I do not know who drew the blood.

15         Q.    Okay.  And what's Ms. Collins' position?

16         A.    At that time -- I was trying to think of the

17    transition -- department chairperson for med lab.

18         Q.    Okay.  And you had a problem with

19    Dr. Maramante bringing her child in to have blood drawn,

20    correct?

21         A.    Yes.

22         Q.    And that was one of the factors that led to

23    your decision to remove her as department chair, correct?

24         A.    Correct.

DR. BOBBI J. BARENDS

Page 52

1      Q.   Was Sue Wiggins removed?  I'm sorry.  Was

2   Ms. -- what was her first name?

3      A.   Who are we talking about?

4           MS. RUSSELL:  Linda Collins.

5   BY MR. JUNGE:

6      Q.   Linda Collins, was she removed?

7      A.   No, she was not.

8      Q.   Was there a lack of judgment on Ms. Collins'

9   part?

10     A.   That would be part of the investigation, I

11  would imagine.

12     Q.   Did that come out in the investigation?

13     A.   That was not shared with me.

14     Q.   Did they tell you that it was Ms. Collins who

15  was going to draw the blood?

16     A.   I don't believe that they did tell me that.

17     Q.   So you're not aware that Ms. Collins was going

18  to draw the blood from Dr. Maramante's son?

19     A.   The only reason I know her name is involved is

20  because that's what Sue Marsh shared with Christy at the

21  picnic, that Lori said she was going to meet with Linda

22  Collins to meet her husband and her son for a blood draw,

23  and that's the only part I know about that.

24     Q.   So what did Brian Shirey share with you?

DR. BOBBI J. BARENDS

Page 53

1        A.    He shared with me a verbal, you know -- that

2   he had concerns that he found that, you know, on at least

3   four occasions, that she had, you know, had family

4   members' blood drawn on the campus.

5        Q.    And that's all he said?

6        A.    It was a verbal conversation.  I can't recall.

7   I do not have a physical document.

8        Q.    Did you ask who drew the blood?

9        A.    I can't recall if I did.

10       Q.    If it happened again today, would you ask that

11  question?

12             MS. RUSSELL:  Objection.  Calls for

13  speculation.  You can answer.

14             THE WITNESS:  I guess it would depend on

15  the situation.

16  BY MR. JUNGE:

17       Q.    So what I'm trying to get at here is you

18  obviously directed Ms. Beaty and Mr. Shirey to conduct an

19  investigation, correct?

20             MS. RUSSELL:  Objection.  Foundation.

21  You can answer.

22             THE WITNESS:  I did, according to this

23  document.

24  BY MR. JUNGE:

DR. BOBBI J. BARENDS

Page 54

1      Q.   Okay.  And they conducted that investigation,

2   correct?

3      A.   Yes.

4      Q.   Okay.  And they reported back to you, correct?

5      A.   Yes.

6      Q.   But the only thing you remember is that

7   Dr. Maramante had blood drawn four times?

8      A.   And brought her child to campus and put the

9   college at significant risk and liability to bring a

10  minor on campus and have blood drawn.  I, as the campus

11  director, it is my job to protect the college at all

12  costs.  And when a department chairperson lacks that much

13  judgment that they bring their child on a campus --

14     Q.   That wasn't --

15     A.   -- to have blood drawn --

16     Q.   Hold on a second.  Hold on a second.  Hold on

17  a second.

18     A.   That is --

19     Q.   That wasn't the question.

20     A.   -- lack of judgment.

21     Q.   Let's stick with the question.  I understand

22  you want to explain why, and I can probably understand

23  why.  But my problem here is there was more than one

24  person involved in this process, correct?

DR. BOBBI J. BARENDS

Page 57

1   assessment we do every year.  Program review was

2   delegated.  That's a department chair's role to really

3   look at the program every five years to really determine

4   what are the strengths, weaknesses, opportunities, and

5   threats.  And scheduling was delegated.  Those were some

6   things that I recall.

7         Q.   Did you have a rough idea of what percentage

8   of her duties were being delegated?

9         A.   I can't say that I had a percentage, no.

10        Q.   Okay.  And I assume from that answer that

11  other department chairs did the same thing, correct?

12  They delegate, maybe not to the same extent, but they do

13  delegate responsibility?

14        A.   Correct.

15        Q.   What research was she focused on?

16        A.   If I recall, she was very involved in tick

17  research.

18        Q.   Okay.  Was she doing tick research?

19        A.   She was leading that with the team, and

20  students were engaged in some of the projects.

21        Q.   When you say she was engaged in tick research,

22  do you mean that she was conducting research into ticks

23  with the intent on publishing her research?

24        A.   I don't know what Lori's intention was.

DR. BOBBI J. BARENDS

Page 58

1          Q.   Could it have been that it was just part of

2     her curriculum?

3          A.   It wasn't just part of the curriculum because

4     it was a very specific research project to the Georgetown

5     campus.

6          Q.   Okay.

7          A.   Yeah.  It came out of, I believe, a special

8     interest that Dr. Maramante had in that area, and our

9     students benefited from that, you know, because they had

10    some nice research projects.  But it was not part of the

11    curriculum, per se, like, this is the research study

12    we're going to do.  That was kind of homegrown, if you

13    will.

14         Q.   Do you know if she was actually doing research

15    into ticks, or if she picked ticks as a subject of

16    research to teach her students how to do research?  And I

17    can break that down if I need to.

18         A.   Yeah, can you?  Because I wasn't following

19    that.

20         Q.   So my understanding is, just to give you some

21    context, is that Dr. Maramante implemented a program

22    where students, instead of just reading about research,

23    were actually going to conduct research, hands-on

24    training so to speak, right?  Is that correct?

DR. BOBBI J. BARENDS

Page 59

1          A.    Yes.   All of our programs of study, they're

2    applied associate degrees so all of our programs of study

3    have an applied nature to them.

4          Q.    So was her tick research just something she

5    picked so they had something to research as part of their

6    research curriculum?  Or do you think that she was

7    actually conducting research into ticks for -- I don't

8    know -- personal reasons?

9                MS. RUSSELL:  Objection.  You can

10   answer.

11               THE WITNESS:  I've known Lori for many

12   years because I was -- as you know, I was the department

13   chair, and she was a faculty member and so I have -- she

14   has spoken to me several times about Lyme's disease and

15   her husband having that and the ticks in Southern

16   Delaware and how all of that is really problematic and

17   challenging.  And that is how she got interested in that,

18   I believe, and I remember many conversations with Lori

19   over the years about ticks, Lyme disease, and kind of the

20   physical impacts of all that.  So I believe that that

21   came to the college out of that personal interest.

22   BY MR. JUNGE:

23         Q.    Okay.  It's probably my lack of familiarity

24   with how colleges work, but when you tell me that she's

DR. BOBBI J. BARENDS

Page 60

1    performing research, I'm assuming you mean she's

2    performing research like professors at the University of

3    Delaware do with grad students coming in and helping them

4    conduct specific research in a specific area to publish

5    results in journals.  Is that what you believe

6    Dr. Maramante was doing?

7         A.   Well, first of all, I want to clarify that

8    Delaware Tech does just as good of research as University

9    of Delaware does, if not better.  And, sorry --

10        Q.   Hold on.  And for the record, when I went to

11   Del Tech to take a trig course for review, I had the

12   department chair there explain to me that trig at Del

13   Tech's the same as trig at Delaware so I get it.

14             MS. RUSSELL:  We all agree.

15             THE WITNESS:  All joking aside, we

16   really do have a rigorous research program at Delaware

17   Tech.  We have research interns.  Our students publish

18   things.  Our students go to conferences, do posters.  So

19   it would not be unusual or -- that a faculty member might

20   publish research that is done.

21             So I know a lot of people don't think

22   about that with, like, a community college, but if you

23   looked at our course offerings, we have research interns.

24   We have our courses, like, research 1, research 2.  Lori

DR. BOBBI J. BARENDS

Page 61

1    was very instrumental and did a beautiful job of helping

2    us develop those courses.  But I can't answer if she was

3    going to publish this information.  I just would have no

4    idea.

5    BY MR. JUNGE:

6        Q.  Well, I guess -- and I don't want to call it

7    an understanding.  I guess my thought would be that if

8    someone was conducting research at Del Tech, that Del

9    Tech would have a vested interest in the research, and it

10   would be monitored in some way.  Is that not correct?

11       A.  We certainly support our faculty engaging in

12   other activities, whether it be research or committee

13   work or on community committees.  I mean, all that

14   enriches our faculty and our student experiences, but it

15   can't take over for the other responsibilities.

16       Q.  I understand that.  But if she's doing

17   scientific research, how is the college not aware?  How

18   is it not monitoring her research?

19       A.  I'm not quite sure what you're asking me.

20       Q.  Let me ask this another way.

21       A.  Okay.

22       Q.  Do you have any documents, any sort of proof

23   that she was conducting research?

24       A.  She and our other faculty, with students, are

DR. BOBBI J. BARENDS

Page 62

1   conducting research, and they present every year, and I'm

2   part of those presentations, and they take posters

3   places.  So I know they're conducting research, and it's

4   approved by the college so I'm not sure where -- what

5   you're asking me.

6        Q.   But you specifically said she was focused on

7   her research.

8        A.   Uh-huh.

9        Q.   Then, if I'm understanding you correctly,

10  you're explaining to me that her students were doing

11  research as part of the curriculum.

12       A.   Uh-huh.

13       Q.   And I think one of us is conflating the two

14  ideas.

15       A.   Okay.

16       Q.   So if her students are doing research, and

17  they're using ticks for whatever reason, and that's part

18  of the curriculum, this is how they're learning to do

19  research, is that the same as Dr. Maramante doing

20  research?

21       A.   I can only speak to the research that is done

22  at the Owens campus and the labs that I oversee at the

23  campus.  And so Lori would be -- would most definitely be

24  part of that as -- at that time, as a department chair,

DR. BOBBI J. BARENDS

Page 63

1    now as a faculty member.  I cannot confirm or deny that

2    Lori has other research endeavors going on.  But what I

3    can say is her focus on research so was so great that it

4    kept her from doing the other aspects of the job.

5        Q.   When you say "her focus on research," do you

6    mean her own personal research or the research curriculum

7    at Del Tech?

8        A.   I can't really differentiate because they're

9    so intertwined.

10       Q.   Okay.  Jump back to the blood draws for a

11   minute, and excuse me if I already asked this.  So the

12   investigators stated that she had blood drawn on four

13   occasions.  Did they ask what the blood draws were for?

14                MS. RUSSELL:  Objection.  Foundation.

15   You can answer.

16                THE WITNESS:  I wasn't in the

17   investigation so you'd have to ask Brian Shirey if he

18   asked that.  I'm not sure.  I don't have that

19   information.

20   BY MR. JUNGE:

21       Q.   But he didn't tell you?

22       A.   No.  May I add one thing?

23       Q.   You may.

24       A.   Okay.  What I understand about the attempted

DR. BOBBI J. BARENDS

Page 69

1    else?

2         A.   I have spoken to Dean Moriarty, who shared

3    that there was some concern that, when Lori was out, that

4    things weren't being taken care of, or the team wasn't

5    sure of what they needed to do in her absence.  So it

6    wasn't the days out that was the challenge, it was the

7    day-to-day operations continuing in the department.

8         Q.   Okay.  All right.  Just for the record...

9              MS. RUSSELL:  I went right up to the end

10   on mine.

11             MR. JUNGE:  Off the record.

12             (Brief recess.)

13             (A document was marked as Dr. Barends

14   Exhibit 5 for identification.)

15   BY MR. JUNGE:

16        Q.   The document I just placed in front of you, do

17   you recognize that document?

18        A.   Yeah, I do.

19        Q.   I was reading back through it again.  I wanted

20   to make sure I was accurate.  So the second full

21   paragraph says "The investigation confirmed that you have

22   delegated many of your administrative responsibilities to

23   others in you department while you focused on your

24   research."  Is the investigation conducted by Mr. Beaty

DR. BOBBI J. BARENDS

Page 72

1          MS. RUSSELL:  I just wanted to make sure
2     because that was going to be confusing in the
3     transcript --
4          THE WITNESS:  Yeah, I'm sorry about
5     that.
6          MS. RUSSELL:  -- when we look at that in
7     a month.
8          THE WITNESS:  Thank you for clarifying
9     or helping me clarify.
10    BY MR. JUNGE:
11         Q.   The information you were receiving -- and,
12    granted, "investigation" might not be the right word, but
13    the information you were receiving came from whom?
14         A.   It came directly from Christy Moriarty as the
15    dean of instruction, who reports to me.
16         Q.   When she was relaying this information to you,
17    did she talk to you about any conversations she had with
18    Dr. Maramante?
19         A.   I can't really recall if she spoke of any
20    conversations.  You know, I knew they met on a, you
21    know -- they meet just like any department chair does so
22    I don't know any specifics.
23         Q.   These were issues of concern, correct?
24         A.   Uh-huh, uh-huh.

```
                                               Page 1
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4
       LORI ANN SCANLON           )
 5     MARAMANTE,                  )
                                   )
 6            Plaintiff,           )
                                   )
 7     vs.                         )   Civil Action No.
                                   )   21-325 RGA
 8     DELAWARE TECHNICAL          )
       COMMUNITY COLLEGE,          )
 9                                 )
              Defendant.           )
10
11
12            A deposition of CHRISTY A. MORIARTY was taken
13     pursuant to notice before Carrie Gold, Court Reporter, in
14     the law offices of Schmittinger & Rodriguez, 414 South
15     State Street, Dover, Delaware, on Tuesday,
16     August 9, 2022, beginning at approximately 12:09 p.m.,
17     there being present:
18
19
20
21
22
               VERITEXT NATIONAL COURT REPORTING COMPANY
23                     MID-ATLANTIC REGION
                   300 Delaware Avenue, Suite 815
24                    Wilmington, DE 19801
                         302-571-0510
```

```
                                                   Page 2
 1      APPEARANCES:
 2                      GARY E. JUNGE, ESQ.
                        Schmittinger & Rodriguez
 3                        414 South State Street
                          Dover, Delaware 19901
 4                        (302) 674-0140
                          gjunge@schmittrod.com
 5                      For the Plaintiff
 6
 7
                        LAUREN MOAK RUSSELL, ESQ.
 8                      Young Conaway Stargatt & Taylor
                          Rodney Square
 9                        1000 North King Street
                          Wilmington, Delaware 19801
10                        (302) 576-3255
                          lrussell@ycst.com
11                      For the Defendant
12
13                      DARRYL A. PARSON, ESQ.
                        Delaware Technical Community College
14                        100 Campus Drive
                          Dover, Delaware 19904
15                        (302) 888-5293
                          darryl.parson@dtcc.edu
16                      For the Defendant
17
18
19
20
21
22
23
24
```

Page 3

I N D E X

                                                    PAGE

TESTIMONY OF CHRISTY A. MORIARTY.............. 4

EXAMINATION BY MR. JUNGE...................... 4




E X H I B I T S

MORIARTY                DESCRIPTION             PAGE

Exhibit 1     Delaware Technical Community      11
              College Department Chairperson
              Evaluation for Lori Maramante,
              DTCC 000067-72
Exhibit 2     Delaware Technical Community      16
              College Department Chairperson
              Evaluation for Lori Maramante,
              DTCC 000062-66
Exhibit 3     Delaware Technical Community      20
              College Department Chairperson
              Evaluation for Lori Maramante,
              DTCC 000056-61
Exhibit 4     Delaware Technical Community      21
              College Department Chairperson
              Evaluation for Lori Maramante,
              DTCC 000040-47

Page 4

1      CHRISTY A. MORIARTY, having first been duly

2    sworn according to law, was examined and testified as

3    follows:

4                        EXAMINATION

5    BY MR. JUNGE:

6      Q.   All right.   Dean Moriarty, have you ever been

7    deposed before?

8      A.   Not to this degree, other than the hearing

9    that I was present in in 2020.

10     Q.   This isn't difficult, but this is my chance to

11   ask you questions under oath, just trying to get

12   information.   Everything we say is going to be taken down

13   by the court reporter.   Because everything is being taken

14   down verbatim, there's a few ground rules we need to

15   follow.   The first one is:   We don't speak at the same

16   time.   So if I ask a question, let me finish asking my

17   question before you answer.   And when you answer, I'll

18   try to let you finish answering your question before I

19   move on to the next one.   That's probably the one rule

20   we're going to break a few times, and she'll yell at us,

21   and we'll move on.

22             Because everything is being typed down,

23   all your responses need to be verbal.   And if it's a yes

24   or no answer, I need a "yes" or "no" instead of an

CHRISTY A. MORIARTY

Page 8

1        A.    I was appointed as the assistant dean of

2    instruction.

3        Q.    Okay.  And who did you work for?

4        A.    Bobbi Barends.

5        Q.    How long were you in that position?

6        A.    I was in the assistant dean role for five

7    years.

8        Q.    So through 2017?

9        A.    Yes.

10       Q.    Were you promoted in 2017?

11       A.    I'm trying to recall the timeline, but, yes,

12   2017 was about the time that I would have been

13   transitioning to the dean of instruction role.

14       Q.    I'm not looking for exact answers on this.

15   I'm just kind of looking for a timeline.  The 2017 one,

16   I'm probably a little more interested in because that's

17   about the time when, from what I've been told is correct,

18   that Dr. Barends, you, and Dr. Maramante all were kind of

19   promoted around the same time up one level.

20       A.    Okay.  Okay.

21       Q.    So in 2017, do you remember the time frame

22   when you became the dean of instruction?

23       A.    It would have been a January transition into

24   that role.

CHRISTY A. MORIARTY

Page 11

1    position?

2         A.   It would have been sometime in September of

3    2019.

4         Q.   Dr. Maramante reported directly to you,

5    correct?

6         A.   Correct.

7         Q.   You get to go through these.  She will give

8    you this after she marks it.

9              (A document was marked as Moriarty

10   Exhibit 1 for identification.)

11   BY MR. JUNGE:

12        Q.   You're going to get all the ones that have

13   little stickers on them so please make sure we have them

14   when you leave.  They're part of the record.

15              Do you recognize this document?

16        A.   Yes.

17        Q.   What is this document?

18        A.   This is a department chair evaluation.

19        Q.   And do you see below the heading, the second

20   line down where it says "Department:  Science - fiscal

21   year 17 (first six months)"?

22        A.   Yes.

23        Q.   What does that mean?

24        A.   This would have been a six-month evaluation as

CHRISTY A. MORIARTY

Page 16

1        A.    I'm assuming similarly at that point in time

2    of the 2017 initial appointment.  But at that point in

3    time, we were starting to notice that she was becoming

4    increasingly -- or sharing that she was feeling

5    overwhelmed in some of her responsibilities.

6        Q.    And, actually, the one I passed you -- that

7    wasn't a fair question.

8              This is a second six-month evaluation in

9    January of 2018 so this was her second evaluation for her

10   first year?

11       A.    I couldn't recall whether that had happened.

12   Yes.

13       Q.    Do you recall any problems up to that point?

14       A.    No.

15             (A document was marked as Moriarty

16   Exhibit 2 for identification.)

17   BY MR. JUNGE:

18       Q.    And do you recall this evaluation?

19       A.    Yes.

20       Q.    How was she doing at this point?

21       A.    Yes.  She was meeting expectations at that

22   point.  There were some concerns as far as her sharing

23   that she was feeling overwhelmed.

24       Q.    Does that say that in here?

CHRISTY A. MORIARTY

Page 17

1        A.    No.

2        Q.    Okay.  Is that something you normally would

3    have put in an evaluation?

4        A.    No.  It would have been -- it would have been

5    a discussion --

6        Q.    Was that discussion --

7        A.    -- during regular update meetings with the

8    employees.

9        Q.    Was that discussion documented?

10       A.    No.

11       Q.    Was she referred to any type of counseling or

12   any kind of professional help through the college?

13       A.    So let me explain how we help to onboard new

14   department chairs.  So we meet monthly, typically, with a

15   new department chair -- and I say "we," typically, myself

16   and the assistant dean of instruction -- just as a

17   touch-point meeting to see how they're doing and if we

18   can provide any support for them in their roles.

19       Q.    Did she express to you that she was feeling

20   overwhelmed in her second six months?

21       A.    I don't recall specifically when she would

22   have shared that, but it was starting to be noticed.

23       Q.    Was it affecting her performance?

24       A.    At that time, no.

CHRISTY A. MORIARTY

Page 18

1      Q.    Then what were you noticing that was showing

2   she was overwhelmed?

3      A.    Well, she was asking for administrative --

4   like, some administrative support.

5      Q.    Okay.  What type of support?

6      A.    Like, having an administrative assistant or a

7   work study or someone who could help to manage

8   responsibilities.

9      Q.    Do other department chairs have administrative

10   assistants?

11      A.    Other campus locations do, but not at the

12   Owens campus.

13      Q.    Okay.  Does the science department chair at

14   the Stanton campus have an administrative assistant?

15      A.    I'm thinking that they may.

16      Q.    Okay.  So you said, around this time, you

17   began to notice that she was feeling overwhelmed; is that

18   correct?

19              MS. RUSSELL:  Objection.  You can answer.

20   You can answer the question.

21              THE WITNESS:  Yes, she was starting to

22   feel overwhelmed.

23   BY MR. JUNGE:

24      Q.    Okay.  And this was from your observation?

CHRISTY A. MORIARTY

Page 19

1          A.    Just conversational.

2          Q.    Okay.  Did she ever say, I'm feeling

3    overwhelmed?

4          A.    I don't recall those exact, maybe, words, but

5    she was definitely feeling that it was a lot of

6    responsibility, things that she was trying to manage.

7          Q.    Okay.  Is it a lot of responsibility?

8          A.    A department chair role?

9          Q.    Yes.

10         A.    Yes.

11         Q.    Okay.  So was she feeling overwhelmed or just

12   expressing that?

13         A.    I guess it could be.

14         Q.    Okay.  What I'm trying to get at is, I mean,

15   some people get in positions like that and say, Whoa,

16   this is a lot, right?  But they handle it.

17         A.    Uh-huh.

18         Q.    Was that the case?  Or was she going, Wow,

19   this is a lot, I can't handle it?  You represented to me

20   that she was feeling overwhelmed.  I'm trying to figure

21   out how you know she was feeling overwhelmed.

22         A.    Well, what, you know -- just sharing in

23   conversation that she felt that, you know, there were

24   things that were overwhelming as far as deadlines and

CHRISTY A. MORIARTY

Page 28

1      Q.   So as of the date on here, September 5th, but

2   it's signed on September 3rd, what concerns did you have

3   about Dr. Maramante's performance as department chair

4   other than timeliness of responses and the budget issue?

5      A.   Can you please restate that?

6      Q.   As of the date this evaluation was signed,

7   September 3rd, what problems had you identified with

8   Dr. Maramante other than the two we just discussed?

9      A.   Suzanne Marsh, her instructional coordinator,

10  had shared with me over the summer of 2019 that she was

11  increasingly covering the responsibilities in the

12  department and wanted some guidance on how to address --

13  or she was sharing that with me at that time, that she

14  felt that the workload was increasing on her.

15     Q.   Did you discuss that with Dr. Maramante?

16     A.   Not at that point in time.

17     Q.   When did you discuss it with her?

18     A.   I didn't discuss specifically Suzanne Marsh's

19  concerns.  What I asked, or what we addressed, is that

20  she was feeling increasingly overwhelmed and getting the

21  timeliness of submission of documents and how she was

22  following up with the department.

23     Q.   Okay.  So Suzanne Marsh came to you with

24  concerns, correct?

CHRISTY A. MORIARTY

Page 29

1      A.    Correct.

2      Q.    Did she ask you not to relay those concerns to

3   Dr. Maramante?

4      A.    At that time, she was trying to figure out how

5   to resolve it.  I don't recall whether she said

6   specifically, Do not go to Dr. Maramante, but she was

7   seeking guidance on what her responsibilities were

8   supposed to be as instructional coordinator.

9      Q.    Through you, not through Dr. Maramante,

10  correct?

11     A.    At that time.

12     Q.    Not going through her direct supervisor, but

13  going over her direct supervisor, correct?

14     A.    She was asking what the instructional

15  coordinator roles were in comparison to the department

16  chair roles.

17     Q.    Did she bypass Dr. Maramante and go to you

18  with that question?

19     A.    I'm not sure if she bypassed Dr. Maramante.

20     Q.    Okay.  And you didn't tell Dr. Maramante that

21  Sue Marsh had issues with the delegation of authority?

22     A.    At that point in time, we were discussing the

23  overall responsibilities of the department and how the

24  Office of Instruction could help support the team to

CHRISTY A. MORIARTY

Page 30

1    ensure people weren't feeling overwhelmed.

2        Q.    Okay.  Is that covered anywhere in the line

3    items in the first two and a half pages?

4        A.    No.

5        Q.    Okay.  So there's not a line item on here that

6    says you're properly delegating or that you're exercising

7    your duties in a proper fashion?

8        A.    It wouldn't have been -- it would not have

9    been part of this evaluation because that was shared with

10   me after the time frame for the department chair

11   evaluations to be submitted.

12       Q.    Well, you said it was the summer of 2019,

13   correct?

14       A.    In, like, the August time frame.

15       Q.    Okay.  And this is September.

16       A.    That she signed it, but the evaluation cycle

17   would have been through July 1 through June 30th.

18       Q.    So you cut off at July 1, and if something bad

19   happens after July 1, it just doesn't make it into the

20   evaluation; is that correct?

21       A.    We could discuss it, but I would not be -- I

22   would be following up on that in the following year as

23   far as the evaluation.

24       Q.    So let's go back.  That's three issues you

CHRISTY A. MORIARTY

Page 53

1    A.    I don't recall the actual timeline, but I do
2    know that she had expressed during times that I met with
3    her that it was obvious that she was feeling overwhelmed
4    in handling the responsibilities.
5    Q.    I mean, if she was feeling she had too much
6    work to do, shouldn't she delegate some of that work?
7         My question is:  How did you determine she
8    was delegating too much aside from your conversation with
9    Sue Marsh?
10    A.    Because, oftentimes, her lack of attendance in
11    certain, you know, times when she was off, she was -- she
12    did not communicate with the team and we -- and Suzanne
13    was basically covering the responsibilities with limited
14    to no direction.
15    Q.    When she was off for what?
16    A.    Whether she was off on leave or whether she
17    was not in the office or not in attendance at work for
18    various reasons.
19    Q.    Okay.  What do you know about the
20    investigation into employee blood draws?
21    A.    So Suzanne Marsh shared with me it was at the
22    end of the week, September 5th or September 6th, that
23    Lori's husband had brought their son on campus to have a
24    blood draw done.

CHRISTY A. MORIARTY

Page 54

1    Q.    And what happened then?

2    A.    I shared with Dr. Barends and informed her

3    what had been shared with me.

4    Q.    Do you know what happened after that?

5    A.    I believe Dr. Barends contacted our legal

6    department.

7    Q.    Were you ever involved in any discussions

8    about the investigation?

9    A.    So Mr. Shirey, Mr. Brian Shirey, had

10   interviewed several faculty members during the time frame

11   in September.  I don't recall the dates.  And so as he

12   interviewed them, that happened in my office in the

13   Office of Instruction conference room.

14   Q.    And you were there?

15   A.    Yes.

16   Q.    Okay.  Do you recall the results of the

17   investigation?

18   A.    I do not.

19   Q.    Do you know if any blood draws were discussed

20   other than the blood draws involving Dr. Maramante or her

21   family?

22   A.    I believe during that questioning, it had been

23   asked if it had happened previously.

24   Q.    When you say asked if it happened previously,

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3

       LORI ANN SCANLON            )
4      MARAMANTE                   )
                                   )
5              Plaintiff           )
                                   )
6      vs.                         )   Civil Action No.
                                   )   21-325 RGA
7      DELAWARE TECHNICAL          )
       COMMUNITY COLLEGE           )
8                                  )
               Defendant           )
9
10
11          The deposition of LINDA COLLINS was taken
12      pursuant to notice before Carrie Gold, Court Reporter, in
13      the law offices of Schmittinger & Rodriguez, 414 South
14      State Street, Dover, Delaware, on Friday,
15      August 19, 2022, beginning at approximately 9:06 a.m.,
16      there being present:
17
18
19
20
21
22
              VERITEXT NATIONAL COURT REPORTING COMPANY
23                   MID-ATLANTIC REGION
              300 Delaware Avenue, Suite 815
24               Wilmington, DE 19801
                   302-571-0510

Page 2

```
 1      APPEARANCES:

 2                      GARY E. JUNGE, ESQ.
                        Schmittinger & Rodriguez
 3                        414 South State Street
                          Dover, Delaware 19901
 4                        (302) 674-0140
                          gjunge@schmittrod.com
 5                      For the Plaintiff

 6

 7

 8                      LAUREN MOAK RUSSELL, ESQ.
                        Young Conaway Stargatt & Taylor
 9                        Rodney Square
                          1000 North King Street
10                        Wilmington, Delaware 19801
                          (302) 576-3255
11                        lrussell@ycst.com
                        For the Defendant
12

13

14                      DARRYL A. PARSON, ESQ.
                        Delaware Technical Community College
15                        100 Campus Drive
                          Dover, Delaware 19904
16                        (302) 888-5293
                          darryl.parson@dtcc.edu
17                      For the Defendant
18

19

20

21

22

23

24
```

Page 3

1

I N D E X

2                                                           PAGE

3    TESTIMONY OF LINDA COLLINS.....................    4

4    EXAMINATION BY MR. JUNGE.......................    4

5

6

7

8

9                    E X H I B I T S

10

     COLLINS              DESCRIPTION              PAGE

11

     Exhibit 1    Text Message to Linda Collins,      9

12                DTCC 000376

     Exhibit 2    Delaware Technical Community        14

13                College Review Officer's
                  Investigation Dated 2/28/2020

14

15        (Exhibits attached to transcript.)

16

17

18

19

20

21

22

23

24

Page 4

1          LINDA COLLINS, having first been duly sworn

2     according to law, was examined and testified as follows:

3                         EXAMINATION

4     BY MR. JUNGE:

5          Q.   Good morning.  How are you doing?

6          A.   Fine.  Yourself?

7          Q.   I'm doing good.

8                         So first question:  Have you ever been

9     deposed before?

10         A.   No.

11         Q.   Okay.  So this is just my opportunity to ask

12    you some questions and to get your answers on the record.

13    You are under oath now, just like you were in court.

14    Same rules apply.  Everything we say will be taken down

15    by the court reporter.  So because she's taking

16    everything down, we need to make sure that she gets a

17    clear record.  So if I'm asking a question, if you could

18    do me a favor and not answer until I finish asking my

19    question, that will help her out.  When you're answering,

20    I'll try to let you finish your question before I ask the

21    next question.  That's the first and biggest rule and

22    probably the one we'll mess up the most, and she'll yell

23    at us, and we'll move on.

24                         Everything you say needs to be verbal so

LINDA COLLINS

Page 5

1    no head shakes.  No "uh-huh" or "huh-uh" because they

2    kind of look the same on paper.  I'm not asking trick

3    questions.  I'm just looking for information so if you

4    don't understand the question, let me know.  We'll

5    rephrase it until we get to a point where you understand

6    it.  If you don't know the answer, that's a perfectly

7    legitimate response.  If you're going to estimate, let me

8    know that you're estimating.  Okay?

9                   If you need a break at any time, let me

10   know.  I'll probably ask you to finish answering the

11   question that's on the table, but this will be painless,

12   or as painless as I can make it.

13        A.    Okay.

14        Q.    So the easy questions first:  Could you please

15   state your name for the record.

16        A.    Linda Collins.

17        Q.    And where do you live?

18        A.    Seaford, Delaware.

19        Q.    Are you married?

20        A.    Yes -- no.  I'm a widow.  Sorry.

21        Q.    Okay.  How long were you married?

22        A.    32 years.

23        Q.    Nice.  Okay.  Children?

24        A.    Yes.

LINDA COLLINS

Page 6

1          Q.    How old?

2          A.    23.

3          Q.    Gone or still living with you?

4          A.    Still living with me.

5          Q.    My daughters are like boomerangs.  They leave

6     and come right back.

7                       So how long have you worked for Del

8     Tech?

9          A.    22 years.

10         Q.    22 years.  What did you do when you first

11    started with Del Tech?

12         A.    I was an instructor.

13         Q.    Okay.  How long were you an instructor?

14         A.    I am still an instructor so 22 years.

15         Q.    But what's your current position?

16         A.    I'm a department chair for a program.

17         Q.    So let's start with you were an instructor.

18    Did you get promoted from that position to a higher

19    position?

20         A.    I got appointed to department chair.

21         Q.    Department chair.  Nothing in between?

22         A.    I was a program coordinator.

23         Q.    Okay.  When did you get promoted to department

24    chair?

LINDA COLLINS

Page 7

1      A.    2015, I believe.

2      Q.    And what department?

3      A.    Medical laboratory technology.

4      Q.    This question has come up a few times, I've

5  been waiting to ask this one.  Are you a phlebotomist?

6      A.    Phlebotomy is a skill of my degree.

7      Q.    Okay.  So help me here a little bit.  If

8  you're drawing blood for the State of Delaware, like if

9  you're drawing blood at the hospital, is there a

10  certification involved there?

11      A.    With my degree, that is a skill that's part of

12  my degree and my certification.

13      Q.    So you can draw blood anywhere?

14      A.    Correct.

15      Q.    So if not technically licensed, you have all

16  the skills and you meet any requirement that the State's

17  going to put on you to draw blood?

18      A.    Yes.

19      Q.    Okay.  I didn't know if there was actually a

20  special license for a phlebotomist.  It sounds like there

21  would be.

22      A.    Well, there is a phlebotomy certification just

23  for that.

24      Q.    But not an actual license from the State?

LINDA COLLINS

Page 8

1    A.    No.

2    Q.    How long have you known Dr. Maramante?

3    A.    I can't say for certain, but it's been quite a

4    few years.  I just can't recall exact.  When she started

5    working there, I just don't remember, but it's been a

6    few -- several years.

7    Q.    So you knew her from the time she started

8    working there?

9    A.    Correct.

10    Q.    Do you remember her being hired?  That's not a

11    fair question.

12          Do you remember around when she started

13    working there?

14    A.    Yes.  She was working in the science

15    department, and so was I.  So, yeah, I'm sure.

16    Q.    Okay.  So one of the things we wanted to talk

17    to you about, and I'm not sure we're going to go much

18    further than this one subject, is the fact that there

19    were blood draws, and apparently there were blood draws

20    on Dr. Maramante and her husband and apparently a dog.

21    I'm not sure where that was -- there was dog blood at

22    some point.  That may have came from the vet.  I'm not

23    sure.  Just for the record, I was getting a quizzical

24    look when I said "dog."

LINDA COLLINS

Page 9

1        So I'm trying to figure out, actually,

2    did you do the blood draws?

3        A.   I did draw blood on Mrs. Maramante in our

4    department.  When we're teaching our students, we have to

5    get samples, and some of the science department

6    volunteers to get samples for our students to do testing

7    on.

8        Q.   Okay.  What about her husband?

9        A.   I don't recall drawing blood on him.  She

10    might have brought blood in.  I mean, I just don't

11    remember.

12        Q.   The blood that was drawn from Dr. Maramante,

13    that was for school use?

14        A.   Yes.

15        Q.   Did you ever draw blood for Dr. Maramante for

16    any other use?

17        A.   No.

18        Q.   Okay.  Do you recall how many times you drew

19    blood?

20        A.   No, I don't recall.

21        Q.   Okay.

22                (A document was marked as Collins

23    Exhibit 1 for identification.)

24    BY MR. JUNGE:

LINDA COLLINS

Page 10

1          Q.   Do you recall this email?  Or, I'm sorry.

2     This is a text.

3          A.   Yes, I do.

4          Q.   Okay.  Or is that an email?

5          A.   No, it's a text.  It was a -- well, it was a

6     text that I emailed.

7          Q.   Okay.  Got it.  Okay.  I saw the email thing

8     up top, and it was confusing me a little bit.  Okay.

9                    Was there a conversation before this

10    email about drawing blood for her son?

11         A.   Not to my knowledge.

12         Q.   Okay.  You don't remember having a

13    conversation where you told her you could take care of

14    drawing the blood?

15         A.   She sent me this text, and said, Could you do

16    it?  And I saw her in the hall, and I can't remember

17    exactly what I said, it's been so long.  But I said, If

18    you -- if I can help you out, I will.

19         Q.   Okay.  Is that something that happens at Del

20    Tech?

21         A.   No.

22         Q.   Okay.  So you've never drawn blood for anybody

23    else for personal reasons?

24         A.   No.

LINDA COLLINS

Page 11

1     Q.    You never drew blood for Dean Moriarty for her

2     son?

3     A.    No.

4     Q.    Do you know if anyone else in the department's

5     drawn blood for anyone else?

6     A.    I can't -- I couldn't speak to that.  I don't

7     know.

8     Q.    Just so I'm clear, the only blood you've drawn

9     for Dr. Maramante was for Del Tech for school reasons --

10    is that correct? -- for the program.

11    A.    No, I drew blood that's referring to this text

12    for her because there was some special test she needed

13    done, and Ben, the child, could not -- had difficulty

14    letting somebody draw blood, and it was some special kit

15    that she needed for some testing somewhere.  I'm not sure

16    where it was.

17    Q.    Did this blood draw happen?

18    A.    I did a blood draw for some special kit that

19    she needed done, some special testing or whatever.  I

20    can't remember exactly if it's from this text or, you

21    know...

22    Q.    How many times did you draw blood for her son?

23    A.    I believe one.

24    Q.    You don't recall when?

LINDA COLLINS

1          A.    No, I don't.  I just -- it's been too long.  I

2    just can't recall.

3          Q.    That's fine.  If I represented to you that the

4    blood draw didn't happen after this email because he was

5    too anxious when he showed up, would that help refresh

6    your memory?

7          A.    That could be a possibility.  I just can't

8    recall.  I'm sorry.

9          Q.    That's fine.  That's a fair answer.

10         A.    Yeah.  I just don't remember.

11         Q.    After this incident, did anyone from the

12    school talk to you about the implications for the school

13    if you drew blood for personal reasons?

14         A.    Yes.

15         Q.    Who talked to you?

16         A.    Mr. Brian Shirey.

17         Q.    What did he say?

18              MS. RUSSELL:  Objection.  If we're

19    getting into legal guidance as to liability, then I think

20    that is an attorney-client privileged communication.

21              MR. JUNGE:  Well, let's go off

22    the record for a second.

23              (Brief discussion.)

24    BY MR. JUNGE:

LINDA COLLINS

Page 13

1      Q.   And what we were just talking about,

2    Mr. Shirey is legal counsel for Del Tech, correct?

3      A.   Yes.

4      Q.   So if he was giving you any type of legal

5    advice or acting as legal counsel, that's protected by

6    attorney-client privilege.  I'm not asking you about

7    that.  I can't ask you about that.  Okay?

8      A.   Okay.

9      Q.   But to the extent he was acting in a role as

10   administrator or that he was admonishing you for doing

11   the blood draw, did that happen at all?

12     A.   He advised me that I should not be doing blood

13   draws for people, that it was not for student use.

14     Q.   Did he tell you that you could be subject to a

15   reprimand by the school?

16            MS. RUSSELL:  And I want to be careful.

17   A reprimand, not legal liability.

18            MR. JUNGE:  Right.  A reprimand by the

19   school.

20            MS. RUSSELL:  Disciplinary action.

21            MR. JUNGE:  Disciplinary action.

22            MS. RUSSELL:  Go ahead.

23            THE WITNESS:  No, he didn't say anything

24   about disciplinary actions.

LINDA COLLINS

Page 14

1   BY MR. JUNGE:

2       Q.   Did they give you any type of verbal warning?

3       A.   They advised me not to do it again.

4       Q.   Did they advise you that they were giving you

5   a disciplinary warning?

6       A.   No.

7       Q.   And no written warning, obviously?

8       A.   No.

9       Q.   Give me one minute.

10              (A document was marked as Collins

11   Exhibit 2 for identification.)

12   BY MR. JUNGE:

13      Q.   So do you recall being interviewed by Martha

14   Hofstetter?

15      A.   Yes.

16      Q.   If you could turn to page 2, starting where it

17   says "Dr. Maramante," but the second full paragraph.

18   Yes.

19      A.   Okay.

20      Q.   Oh, no.  It's down -- you were right.

21      A.   This one?

22      Q.   No, down one.

23      A.   That one.  Okay.  I'm sorry.

24      Q.   I think the next page and a half, maybe even a

LINDA COLLINS

Page 17

1   home medical test send out kit."  Now, do you recall

2   actually drawing blood from her son?

3        A.   I did draw blood from her son for this special

4   kit that she needed done.

5        Q.   Do you recall when that was?  I know it's

6   been --

7        A.   No, I don't recall when.

8        Q.   Okay.  Did anyone else know about that blood

9   draw?

10       A.   I'm not sure.

11       Q.   I mean, were there any efforts to keep it

12   secret?

13       A.   No, not to my knowledge.

14       Q.   Did you think there was any problem with doing

15   that?

16       A.   No.

17       Q.   Okay.  Was it done on school time?

18       A.   Yes.  Done on school property, yes.

19       Q.   On school property, but was she on break, or

20   were you on break?

21       A.   I don't know.  Can't remember.

22       Q.   Were any school resources used for the blood

23   draws?

24       A.   No, she provided everything.

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

     LORI ANN SCANLON          )
4    MARAMANTE                 )
                               )
5            Plaintiff         )
                               )
6    vs.                       )    Civil Action No.
                               )    21-325 RGA
7    DELAWARE TECHNICAL        )
     COMMUNITY COLLEGE         )
8                              )
             Defendant         )

9

10

11            The deposition of SUZANNE M. MOONEY-MARSH was

12   taken pursuant to notice before Carrie Gold, Court

13   Reporter, in the law offices of Schmittinger & Rodriguez,

14   414 South State Street, Dover, Delaware, on Friday,

15   August 19, 2022, beginning at approximately 10:42 a.m.,

16   there being present:

17

18

19

20

21

22

            VERITEXT NATIONAL COURT REPORTING COMPANY
23               MID-ATLANTIC REGION
             300 Delaware Avenue, Suite 815
24               Wilmington, DE 19801
                   302-571-0510

```
                                                    Page 2

 1       APPEARANCES:

 2                       GARY E. JUNGE, ESQ.

         Schmittinger & Rodriguez

 3          414 South State Street

            Dover, Delaware 19901

 4          (302) 674-0140

            gjunge@schmittrod.com

 5       For the Plaintiff

 6

 7

 8                       LAUREN MOAK RUSSELL, ESQ.

         Young Conaway Stargatt & Taylor

 9          Rodney Square

            1000 North King Street

10          Wilmington, Delaware 19801

            (302) 576-3255

11          lrussell@ycst.com

         For the Defendant

12

13

14                       DARRYL A. PARSON, ESQ.

         Delaware Technical Community College

15          100 Campus Drive

            Dover, Delaware 19904

16          (302) 888-5293

            darryl.parson@dtcc.edu

17       For the Defendant

18

19

20

21

22

23

24
```

Page 3

1

I N D E X

2                                                              PAGE

3    TESTIMONY OF SUZANNE M. MOONEY-MARSH........... 4

4    EXAMINATION BY MR. JUNGE...................... 4

5    EXAMINATION BY MS. RUSSELL................... 59

6    FURTHER EXAMINATION BY MR. JUNGE.............. 61

7

8

9

10

11                      (No exhibits marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1          SUZANNE M. MOONEY-MARSH, having first been duly

2     sworn according to law, was examined and testified as

3     follows:

4                          EXAMINATION

5     BY MR. JUNGE:

6          Q.   So, Ms. Marsh, how are you doing?

7          A.   I'm okay.

8          Q.   Have you ever been deposed before?

9          A.   No.  I was a character witness on a divorce

10    case, that's it.

11         Q.   All right.  So this is my chance to ask you

12    some questions and get some information.  So you're under

13    oath just like you were in court.  We have a court

14    reporter who's going to take down everything we say.

15    Okay?

16         A.   Uh-huh.

17         Q.   Because she's taking down everything we say,

18    we need to make sure we don't talk over each other.

19         A.   Okay.

20         Q.   So if I ask a question, make sure you let me

21    finish asking my question before you answer.  And if

22    you're answering, I'll try to wait until you finish your

23    answer before I move on to the next question.  It's hard.

24    Just like with the last person here, it gets

SUZANNE M. MOONEY-MARSH

Page 9

1      Q.    So what you just read, does that accurately

2    reflect the information that you gave to Ms. Hofstetter.

3    You can keep that, please.

4      A.    I don't recall all of it.  I mean, I...

5      Q.    Okay.  Let's go ahead and look through it a

6    little bit.  If you could turn to page 11, please.

7      A.    Okay.

8      Q.    At the very top of this page where it says

9    "Ms. Marsh stated that the department expressed concerns

10   over Dr. Maramante's appointment due to excessive

11   absenteeism," what's that referring to?

12     A.    So there was a meeting when Lori was applying

13   for the position, and that was one of the concerns.

14     Q.    Okay.  Who raised the concern?

15     A.    I believe it was Dr. Buoni, but I can't say

16   for sure.

17     Q.    Did you have any concerns?

18     A.    I did not voice them.

19     Q.    Okay.  But did you have concerns?

20     A.    I did.

21     Q.    Okay.  And why did you have concerns?

22     A.    Because it was my thought at the time that she

23   was out a lot.

24     Q.    Okay.  It says that she spent a lot of her

SUZANNE M. MOONEY-MARSH

Page 29

1    mean, I...

2          Q.    And then Ms. Hofstetter wrote "Dr. Maramante

3    would share with Ms. Marsh long, drawn-out sob stories of

4    sickness within her family."

5          A.    Yes.

6          Q.    What kind of sob stories?

7          A.    You know, I was always very compassionate

8    with, you know -- I met Lori -- and I'll start from the

9    beginning.  I met Lori when I was an adjunct, and she

10   herself, she was, you know, wearing a mask at work.  You

11   know, she had lupus, or she had said she had lupus at the

12   time.  And she was, you know, worried about things in the

13   environment, and we had talked a lot about her.  And then

14   her sister became very sick, and, you know, she needed to

15   go back and forth between California and various places.

16              I would work for her sometimes.  You

17   know, I would -- if she needed -- if she needed to run to

18   her family, I was one of the first people, I believe,

19   that she would call to cover a class or cover a lab.  I

20   didn't mind helping.  I would, you know -- I had to do a

21   lot to get there.  I had three at the time, and I -- so,

22   you know, then when I became in, you know -- full time, I

23   got to know Lori a little bit better.  And she, you know,

24   still was dealing with some issues with her sister, and

SUZANNE M. MOONEY-MARSH

Page 30

1    then she got sick again.

2              And, you know, fast forward, she adopted

3    her little boy, and he was adorable.  He seemed, you

4    know, healthy.  I attended the baby shower.  I was

5    friends with her.  And Ben started to become sick.  And,

6    you know, their concern was Lyme's disease at the time.

7    And she had approached me when she started the research.

8    She had said that, you know, she was worried that people

9    would think that she was studying, you know, because Ben,

10   at that point, had had Lyme's.  They adopted a little

11   girl, and then the little girl became sick.  And I was

12   always very compassionate about everything.  I was always

13   trying to help.  I felt like she needed help.  She

14   needed, you know -- these stories were terrible so we

15   developed that relationship.

16             And, you know, then, you know -- then it

17   just became a little bit more uncomfortable.  She played

18   a tape for me of the kid -- of Ben having a situation,

19   and she was on the other end.  She played tapes to me of

20   him in her car.  You know, another tape of Elizabeth.

21   And I was just becoming uncomfortable with the

22   conversations.  And she had discussed, you know, things

23   with her husband, his testosterone.  You know, you know,

24   he was not -- he was very tired all the time, unable to

SUZANNE M. MOONEY-MARSH

Page 31

1    get to bed.

2             You know, shared a story one time that

3    Elizabeth had gone out in the middle of the night and

4    walked down a long dark road.  I was going to a

5    department chair meeting and she -- first thing she said

6    when I sat down was that she put Ben in the car naked.

7    And all I could think to myself was, He's 10.  He was,

8    you know, 10 years old at the time.  It just became very

9    uncomfortable, the stories and the situations.  I can't

10   say that enough.

11        Q.   Okay.

12        A.   So I was always trying to help, but then I,

13   you know, just started to think that I needed to start

14   stepping back a little bit from some of that, and she

15   knew that.  She would say, Suzanne's heard so much of

16   this when I would be present and she was telling other

17   people.

18        Q.   Okay.  But you two had been friends for quite

19   a while?

20        A.   We had been friends, yes.  And it had -- yes.

21   It led to -- it was -- became very uncomfortable.

22        Q.   Okay.  When you had your conversation with

23   Ms. Hofstetter, is that how you described it, like you

24   did to me?  Or did you actually say "long, drawn-out sob

SUZANNE M. MOONEY-MARSH

Page 32

1    stories"?

2            A.   I don't remember saying those words.  I mean,

3    I don't -- that doesn't -- I don't know.

4            Q.   I think what you just described to me, the

5    last sentence says "Ms. Marsh stated that she reached a

6    point where she felt it was not going to end.  There was

7    always something new, something chronic, and something

8    overwhelming in Dr. Maramante's life."  Is that what you

9    were just talking about?

10           A.   Well, in the very end, when I had gone to her

11   office to talk about work stuff, she had -- she was

12   telling me about her husband having, you know, kidney

13   issues and specifically his GFR.  And, you know, she

14   flipped around her computer and said, Look at this.  You

15   know, what's -- and I just thought to myself, This is

16   never going to end.  You know, I...

17           Q.   Okay.  And it says you "testified that at the

18   end of the day, Dr. Maramante just could not do her job."

19           A.   I don't remember saying that.  I don't

20   remember saying that she, you know -- I don't remember

21   those words.

22           Q.   Okay.  Did you feel Ms. Maramante could not do

23   her job?

24           A.   I felt that she was extremely stressed out and



**DELAWARE**
TECHNICAL ◆ COMMUNITY
**COLLEGE**

MEMORANDUM

TO:        Lori A. Maramante

FROM:    Dr. Bobbi Barends, Vice President and Campus Director

CC:        Dr. Valencia "Lynn" Beaty, Vice President for Human Resources
           Christy Moriarty, Dean of Instruction

DATE:     November 11, 2019

RE:        Department Chair Appointment

As you are aware, the College initiated an investigation into concerns associated with your management of the Owens Campus science department prior to your recent departure on leave. These concerns included reports that you were not personally performing your administrative responsibilities as department chair, as well as allegations that you had college employees draw blood from your family members while in the course of their employment. In addition, given your research into tick-borne illness, the possibility that you may have been engaged in unauthorized human subjects research was also investigated.

The investigation confirmed that you have delegated many of your administrative responsibilities to others in your department while you focused on your research. The investigation also confirmed that you had College employees draw blood from members of your family on at least four occasions while in the course of their employment with the College. Although there is no indication that you engaged in human subjects research, college resources were used to further your private interests.

The research you are leading is important, but should not take precedence over your responsibilities as department chair. In addition, the use of college resources to draw blood from your family members evidences a lack of judgement.

Department chairpersons serve at the pleasure of the vice president and campus director. I have lost confidence in your ability to manage the science department in a manner that prioritizes College operations and student success for the reasons stated above. As a result, effective today, Monday, November 11, 2019, I am rescinding your appointment as department chair and returning you to a 10-month faculty position in the science department. You are an excellent instructor and an asset to our students, and it is my sincere hope that you will continue to apply your talents in the classroom as a member of the team.

#7

## Bobbi Barends

| | |
|---|---|
| **From:** | Bobbi Barends |
| **Sent:** | Monday, September 9, 2019 9:42 AM |
| **To:** | Brian D Shirey; Valencia 'Lynn' Beaty |
| **Cc:** | Janis Beach |
| **Subject:** | CONFIDENTIAL - Investigation requested |

**Importance:**      High

Brian and Lynn,

It has come to my attention that a DTCC employee allegedly performed a quasi-medical procedure (blood draw) on children of another DTCC employee at the Owens Campus. I am requesting an investigation of this allegation to determine if these employees, indeed, performed these actions. I am certain that there are many other related issues that may arise out of this investigation, but the first priority is to determine if these employees worked in collaboration to draw blood from an employee's children at the Owens Campus. Clearly, I am concerned that employees may have put a their personal interest(s) above the interests of the College, therefore placing the College (and the children) at risk. Please contact me for more specific information.

Bobbi

Bobbi J. Barends, Ph.D.
Vice President and Campus Director
Delaware Technical Community College
Jack F. Owens Campus
21179 College Drive
Georgetown, DE 19947
302.259.6020

1

**Christy A Moriarty**

| | |
|---|---|
| From: | Christy A Moriarty |
| Sent: | Tuesday, October 8, 2019 10:44 AM |
| To: | Bobbi Barends; Janis Beach; Carol C Bunting |
| Subject: | RE: LM Leave of Absence/FMLA |

Good morning,

I met with Michael Buoni and Suzanne Marsh yesterday to discuss next steps in the Science department leadership during Lori's absence. Suzanne has agreed to serve as the interim department chair and Michael has agreed to serve as the interim instructional coordinator. The roles and responsibilities were reviewed, discussed, and agreed upon by both. Suzanne will continue to handle all duties associated with the AOS program, advisement, student issues, scheduling, textbook orders, etc. Michael will continue to oversee all responsibilities related to grants, research, Biotech, and coordination needed CW for these duties.

After meeting with Michael and Suzanne, I met with the science team to ensure them that we were working on the interim leadership plan. They were all very willing to assist and provide support in any areas, as needed. I am confident that the team will work closely together to ensure continued smooth operations.

Please let me know how I can help with next steps.

Thank you,
Christy

From: Bobbi Barends <bobbi.barends@dtcc.edu>
Sent: Friday, October 4, 2019 10:38 PM
To: Janis Beach <janis.beach@dtcc.edu>; Carol C Bunting <cbunting@dtcc.edu>
Cc: Christy A Moriarty <christy.moriarty@dtcc.edu>
Subject: LM Leave of Absence/FMLA

Janis & Carol,
This afternoon, Christy and I had some time to talk with Suzanne Marsh, Science Instructional Coordinator, and Michael Buoni, Science Instructor, regarding possible next steps for leadership coverage while Lori M. is out on extended leave. We would like to propose the following path forward:
- Christy, Michael, and Suzanne will meet on Monday, 10/7 to discuss possible roles and responsibilities, job titles, and compensation related to any interim appointments while Lori is away from campus on approved leave.
- Christy will present a recommendation to me on 10/14 re: next steps.
- Lori will need to be notified by HR that while on approved FMLA, she should not be emailing/communicating with her team/colleagues. We will be appointing an interim DC during her absence who will fulfil these responsibilities.
Please work with Christy on next steps.
Bobbi

Bobbi J. Barends, Ph.D.

1

# DELAWARE TECHNICAL COMMUNITY COLLEGE
## DEPARTMENT CHAIRPERSON EVALUATION

RECEIVED

**DEPARTMENT CHAIRPERSON:** Lori Maramante

**DEPARTMENT:** Science - FY17 (1st 6 months)

**Section I-Rate the Department Chair performance for each criterion utilizing the following descriptors.**

AUG 0 9 2017
SC-OWENS CAMPUS
HUMAN RESOURCES

Select One From Each Drop Down Menu

Comments

## A. DEPARTMENT LEADERSHIP OF FACULTY & STAFF

| | | | |
|---|---|---|---|
| 1. | Works to build a cohesive department by promoting a positive, supportive climate with good morale, cooperation, and collegiality. | Exceeds Expectation | See Faculty Perception responses |
| 2. | Encourages, supports, and contributes to excellence in teaching and a quality learning environment for students. | Exceeds Expectations | |
| 3. | Fosters a climate of respect among students, faculty, staff, and administration. | Meets Expectations | |
| 4. | Models and fosters good communication within the department. | Meets Expectations | |
| 5. | Effectively uses problem solving skills to facilitate resolution of faculty, staff, and/or student problems within the department. | Meets Expectations | |
| 6. | Deals with stressful situations in a professional manner. | Meets Expectations | |
| 7. | Actively participates in the hiring process for new faculty and support staff and recommends final candidates for positions. | Exceeds Expectation | Served on hiring committees to fill positions |
| 8. | Recruits, supervises, and evaluates adjunct faculty and part-time staff. | Meets Expectations | |
| 9. | Facilitates orientation for new department faculty (full and adjunct) and staff. | Meets Expectations | |
| 10. | Effectively supervises full-time faculty and support staff. | Meets Expectations | |
| 11. | Annually evaluates full-time faculty and support staff, providing formative feedback and guidance for personal, professional, and departmental growth. | Meets Expectations | |
| 12. | Encourages and supports the development of faculty and staff members' special talents, interests, and participation in professional meetings and activities. | Meets Expectations | |
| 13. | Coordinates departmental trainings or workshops in response to campus and collegewide initiatives and departmental needs. | Meets Expectations | |
| 14. | Effectively communicates and guides department through implementation of College policies and initiatives. | Meets Expectations | |
| 15. | Informs and supports active involvement of faculty and staff in department, campus, and college goals, activities, and initiatives. | Meets Expectations | |
| 16. | Promotes use of alternative instructional delivery strategies that meet the diverse needs of students and enhance student engagement. | Meets Expectations | |
| 17. | Promotes use of educational technology in response to collegewide initiatives to enhance the teaching-learning process. | Meets Expectations | |
| 18. | Identifies and develops individuals with potential to serve in future academic leadership roles. | Meets Expectations | |
| 19. | Assigns teaching loads equitably while balancing the needs of the Department, Campus, and College. | Meets Expectations | |

## B. DEPARTMENT ORGANIZATION & COORDINATION

| | | | |
|---|---|---|---|
| 1. | Develops and maintains a department "vision" consistent with campus and college goals to foster the Department's areas of strength. | Exceeds Expectations | |
| 2. | Builds commitment for the Department's vision by encouraging a culture of equity, respect, and collaboration. | Meets Expectations | |
| 3. | Explores, develops, and makes timely and logical decisions for growth and development within the department, including new programs, instructional delivery systems, program options, and bridge programs with the Corporate and Community Programs Division. | Meets Expectations | |

1

CONFIDENTIAL

DTCC_000067

## B. DEPARTMENT ORGANIZATION & COORDINATION (con't.)

| # | Description | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 4. | Develops and maintains excellence in academic programming by reviewing and modifying curriculum, course syllabi, and performance objectives in response to advisory committee recommendations and labor market needs and composes materials for appropriate college publications. | Meets Expectations | |
| 5. | Positions and represents the department in such a way as to ensure that department needs are evident and the department is acknowledged internally and externally for its contributions. | Meets Expectations | |
| 6. | Manages program accreditation/evaluation processes and prepares and submits appropriate documents in a timely manner to the Dean of Instruction for review prior to final submission. | Not Applicable | |
| 7. | Analyzes enrollment trends, room availability and, when appropriate, collaborates with other department chairs to develop and modify the department's master schedule offerings for submission to the Dean of Instruction. | Meets Expectations | |
| 8. | Recommends and participates in student recruitment as appropriate. | Meets Expectations | |
| 9. | Maintains a system of student records for students and graduates. | Meets Expectations | |
| 10. | Facilitates and supports collaboration with Student Services to meet best practices in student advisement. | Meets Expectations | |
| 11. | Coordinates and actively engages in student advisement to facilitate student success in meeting student's educational and career goals. | Meets Expectations | |
| 12. | Develops and implements articulation agreements with high schools (Tech Prep) and four-year institutions (Connected Degree). | Exceeds Expectations | Dual enrollment |
| 13. | Develops and manages department budget and seeks alternative funding sources when appropriate. | Meets Expectations | |
| 14. | Seeks out and promotes opportunities for collaboration with internal and external stakeholders, which benefits the department, the faculty, and the College. | Meets Expectations | |
| 15. | Establishes and maintains an active advisory committee that provides recommendations and support for departmental growth and improvement; distributes meeting minutes and retains departmental copy. | Meets Expectations | |
| 16. | Requisitions departmental instructional texts, materials, supplies, and equipment, as well as manages inventory. | Meets Expectations | |
| 17. | Recommends to the Library purchase of reference materials relevant to the department. | Meets Expectations | |
| 18. | Evaluates courses submitted for advanced standing, including credit by examination, transfer credit, prior learning, advanced placement, and tech prep. | Meets Expectations | |
| 19. | Certifies students have met graduation requirements. | Meets Expectations | |
| 20. | Recommends faculty and staff to serve on department, campus, and collegewide committees. | Meets Expectations | |
| 21. | Works collaboratively with collegewide counterpart(s) to ensure the goals of the Instructional Division are met (if applicable). | Meets Expectations | |
| 22. | Schedules, prepares agenda for, and presides over regularly scheduled departmental meetings; distributes minutes to department members, and retains department copy. | Meets Expectations | |
| 23. | Coordinates a program with multiple sites throughout the state (if applicable). | Not Applicable | |
| 24. | Supervises off-site training and/or clinical sites and their respective Instructional Coordinators or Program Coordinators (if applicable). | Not Applicable | |

## C. DEPARTMENT PLANNING & ASSESSMENT

| # | Description | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Provides leadership to increase student success with graduation, progression, and retention. | Meets Expectations | |
| 2. | Coordinates, encourages, and leads department faculty in engaging in program level assessment of student learning, including implementation of recommended improvement actions. | Meets Expectations | |

2

CONFIDENTIAL
DTCC 000068

**C. DEPARTMENT PLANNING & ASSESSMENT (con't.)**

| | Select One From Each Drop Down Menu | Comments |
|---|---|---|
| 3.   Works collaboratively with SLOA committee to ensure the completion of the assessment process and timely submission of reports. | Meets Expectations | |
| 4.   Develops, monitors, and reports progress related to the department's annual objectives, as part of the Instructional Division's annual campus Plan process. | Meets Expectations | |
| 5.   Integrates department goals with Campus and College goals and missions. | Meets Expectations | |
| 6.   Monitors and reports critical effectiveness indicators (i.e. graduation rates, licensure pass rates, and job placement rates) and implements actions to improve performance. | Meets Expectations | |
| 7.   Conducts, analyzes, and makes recommendations related to the program review process. | Meets Expectations | |
| 8.   Implements department and collegewide Deans of Instruction's recommendations from program review process. | Meets Expectations | |

**D. PRINCIPAL ACCOUNTABILITIES OF INSTRUCTOR POSITION**

| | Select One From Each Drop Down Menu | Comments |
|---|---|---|
| 1.   Fulfills principal accountabilities of Instructor position. | Exceeds Expectation | |

---

**SECTION II-SYNOPSIS OF FACULTY SURVEYS:**

Four (4) faculty members completed the Faculty Perception Survey with an overall rating of "Very Good to Excellent". Comments included, "Lori is an asset to the college and to the chair position in our department. She is smart, understanding and very professional. I just can't say enough about the job she is doing." and "Some things do not apply yet, and she has not had time to make her own impact."

Additional comments, " Lori is not just managing our department, she is leading us. She has a vision that I am excited about." and " I appreciate the fact that she is willing to let go of the reins and invites the department to make changes and decisions on lab books, etc."

---

**SECTION III-GOALS:** Indicate the progress which has been made in achieving the major goals which were set to be accomplished during this annual review period, and explain the progress which has been made.

Not applicable - new to position

---

**Were goals accomplished?**     ☐ YES    ☐ NO    ☐ In Progress

**Explain:**

---

**SECTION IV-Future Goals:**  List those major goals which you would like to accomplish in the next year.

3

CONFIDENTIAL

DTCC 000069

·1) Improve laboratory safety, especially with respect to chemical hygiene by cleaning up hazardous wastes, updating the chemical hygiene plan, integrating waste management into new laboratory exercises and setting up a cloud based chemical inventory.

2) Implement the revision of the biological sciences curriculum, including the launch of two new courses, Genetics and Molecular Biology.

3) Finish my EdD in science education.

4) Use our external grant support to implement science education best practices such as integrating scientific research across the curriculum.

5) Implement any recommendation outcomes from the Food Safety Program review.

6) Develop departmental management documents to assist with budgeting, resource use, and standard operating procedures.

7) Implement at least 2 team building activities for the department.

8) Implement a Science placement test in collaboration with college-wide colleagues.

## SECTION V-EVALUATOR SUMMARY:

Ms. Maramante meets or exceeds expectations for all the principal accountabilities of the department chair position. She has transitioned well into the role as department chair as of January 2017. During this time of transition, several new positions and changes occurred as a result of retirements. Ms. Maramante served on several hiring committees to start with a full team by fall semester.

Faculty perceptions have indicated Ms. Maramante's willingness to include them in decision-making and being supportive of ideas and innovation within the department. She is focused on safety and is committed to fostering a climate of collegiality to provide the most effective instruction for students. She recognizes the talent within the department and encourages both personal and professional growth of her colleagues.

Ms. Maramante transitioned during the time of budget preparations and did an outstanding job with identifying needs and developing a plan for the future. She anticipates budgetary needs, particularly when curricular changes impact resources and materials needed for the classroom. She has taken on the daunting task of organizing, inventorying, and "cleaning up" the labs and prep rooms in preparation for the fall semester. When she identifies issues or concerns, she promptly communicates needs in an effort to minimize future impact.

Ms. Maramante has embraced advisement of the AOS students which resulted in eight graduates during the first semester of offering the program. She is an exceptional instructor which is evident in student responses on course evaluations.

The deans appreciated Ms. Maramante's leadership and look forward to working with her in the upcoming year.

## SECTION VI-DEPARTMENT CHAIRPERSON COMMENTS AND RESPONSES:

4

CONFIDENTIAL

DTCC 000070

**SIGNATURES:**

I acknowledge I have read the evaluation and understand it will be placed in my personnel folder.

_____    8/8/17    _____    8/8/17
Dean of Instruction          Date      Department Chairperson        Date

5

CONFIDENTIAL                                      DTCC 000071

# DESCRIPTORS

| DID NOT ACHIEVE EXPECTATIONS | NEEDS SOME IMPROVEMENT | MEETS EXPECTATIONS | EXCEEDED EXPECTATIONS |
|---|---|---|---|
| Performance significantly below expectations; seriously deficient in meeting goals and objectives of specific assignments.  Performance is inadequate and/or inconsistent performance, which does not meet the requirements for the position.  <u>Detailed plan of specific actions to improve performance required.</u>  The department chair may have difficulty improving his/her performance sufficiently to fully achieve expectations within a reasonable time. | Meets some of the areas listed under "achieves expectations" however areas of the work performance may be below the expectations for the position.  It is reasonable to expect that the department chair can, with focused effort, training, and growth, bring performance up to an acceptable level within a reasonable time period.  <u>Plan of specific actions to improve performance required.</u> | Consistent performance at expected levels that achieves goals and objectives of specific assignments.  Work meets standard expectations and shows a clear depth and breadth of understanding of all aspects of the job.  Is able to obtain cooperation and high performance from others, takes initiation in all aspects of the job.  Work quality and quantity contributes in important ways to accomplish the department's, area's and/or College's goals.   This rating is NOT to be used if there are performance problems or concerns. | Consistent performance at a level that significantly exceeds the performance of most other employees, often with work at the "exceptional" or "outstanding" level.  Work continually exceeds standard expectations and demonstrates an accomplished understanding of all aspects of the job. The department chair is recognized by others as extremely knowledgeable in the field and clearly leads by example.  Anticipates and develops critical goals in alignment with the College's strategic direction and ensures their implementation and success. |

6

CONFIDENTIAL

DTCC 000072

# DELAWARE TECHNICAL COMMUNITY COLLEGE
## DEPARTMENT CHAIRPERSON EVALUATION

**DEPARTMENT CHAIRPERSON:** Lori Maramante

**DEPARTMENT:** Science - 2nd 6 month evaluation - January 2018

**Section I-Rate the Department Chair performance for each criterion utilizing the following descriptors.**

## A. DEPARTMENT LEADERSHIP OF FACULTY & STAFF

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Works to build a cohesive department by promoting a positive, supportive climate with good morale, cooperation, and collegiality. | Exceeds Expectation | Supports faculty and staff |
| 2. | Encourages, supports, and contributes to excellence in teaching and a quality learning environment for students. | Exceeds Expections | Advocates for resources and safety of the labs |
| 3. | Fosters a climate of respect among students, faculty, staff, and administration. | Meets Expectations | |
| 4. | Models and fosters good communication within the department. | Meets Expectations | |
| 5. | Effectively uses problem solving skills to facilitate resolution of faculty, staff, and/or student problems within the department. | Meets Expectations | |
| 6. | Deals with stressful situations in a professional manner. | Meets Expectations | |
| 7. | Actively participates in the hiring process for new faculty and support staff and recommends final candidates for positions. | Meets Expectations | |
| 8. | Recruits, supervises, and evaluates adjunct faculty and part-time staff. | Exceeds Expectation | Working to expand the adjunct pool |
| 9. | Facilitates orientation for new department faculty (full and adjunct) and staff. | Meets Expectations | |
| 10. | Effectively supervises full-time faculty and support staff. | Meets Expectations | |
| 11. | Annually evaluates full-time faculty and support staff, providing formative feedback and guidance for personal, professional, and departmental growth. | Meets Expectations | |
| 12. | Encourages and supports the development of faculty and staff members' special talents, interests, and participation in professional meetings and activities. | Exceeds Expectation | Encourages faculty professional development and enhancing the strengths of all faculty members |
| 13. | Coordinates departmental trainings or workshops in response to campus and collegewide initiatives and departmental needs. | Meets Expectations | |
| 14. | Effectively communicates and guides department through implementation of College policies and initiatives. | Meets Expectations | |
| 15. | Informs and supports active involvement of faculty and staff in department, campus, and college goals, activities, and initiatives. | Meets Expectations | |
| 16. | Promotes use of alternative instructional delivery strategies that meet the diverse needs of students and enhance student engagement. | Meets Expectations | |
| 17. | Promotes use of educational technology in response to collegewide initiatives to enhance the teaching-learning process. | Meets Expectations | |
| 18. | Identifies and develops individuals with potential to serve in future academic leadership roles. | Meets Expectations | |
| 19. | Assigns teaching loads equitably while balancing the needs of the Department, Campus, and College. | Meets Expectations | |

## B. DEPARTMENT ORGANIZATION & COORDINATION

| | | | |
|---|---|---|---|
| 1. | Develops and maintains a department "vision" consistent with campus and college goals to foster the Department's areas of strength. | Exceeds Expectations | Maintains high standards and has vision for the faculty development to deliver quality education |
| 2. | Builds commitment for the Department's vision by encouraging a culture of equity, respect, and collaboration. | Exceeds Expectations | Supportive of new faculty |
| 3. | Explores, develops, and makes timely and logical decisions for growth and development within the department, including new programs, instructional delivery systems, program options, and bridge programs with the Corporate and Community Programs Division. | Meets Expectations | |

1

CONFIDENTIAL

DTCC 000062

## B. DEPARTMENT ORGANIZATION & COORDINATION (con't.)

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 4. | Develops and maintains excellence in academic programming by reviewing and modifying curriculum, course syllabi, and performance objectives in response to advisory committee recommendations and labor market needs and composes materials for appropriate college publications. | Meets Expectations | Proposed Biotechnology curriculum changes continues to be explored |
| 5. | Positions and represents the department in such a way as to ensure that department needs are evident and the department is acknowledged internally and externally for its contributions. | Meets Expectations | |
| 6. | Manages program accreditation/evaluation processes and prepares and submits appropriate documents in a timely manner to the Dean of Instruction for review prior to final submission. | Meets Expectations | |
| 7. | Analyzes enrollment trends, room availability and, when appropriate, collaborates with other department chairs to develop and modify the department's master schedule offerings for submission to the Dean of Instruction. | Meets Expectations | |
| 8. | Recommends and participates in student recruitment as appropriate. | Meets Expectations | |
| 9. | Maintains a system of student records for students and graduates. | Meets Expectations | |
| 10. | Facilitates and supports collaboration with Student Services to meet best practices in student advisement. | Meets Expectations | |
| 11. | Coordinates and actively engages in student advisement to facilitate student success in meeting student's educational and career goals. | Meets Expectations | |
| 12. | Develops and implements articulation agreements with high schools (Tech Prep) and four year institutions (Connected Degree). | Meets Expectations | Dual enrollment & pathway agreements |
| 13. | Develops and manages department budget and seeks alternative funding sources when appropriate. | Meets Expectations | |
| 14. | Seeks out and promotes opportunities for collaboration with internal and external stakeholders, which benefits the department, the faculty, and the College. | Meets Expectations | |
| 15. | Establishes and maintains an active advisory committee that provides recommendations and support for departmental growth and improvement; distributes meeting minutes and retains departmental copy. | Meets Expectations | Work to expand Biotechnology advisory committee |
| 16. | Requisitions departmental instructional texts, materials, supplies, and equipment, as well as manages inventory. | Meets Expectations | |
| 17. | Recommends to the Library purchase of reference materials relevant to the department. | Meets Expectations | |
| 18. | Evaluates courses submitted for advanced standing, including credit by examination, transfer credit, prior learning, advanced placement, and tech prep. | Meets Expectations | |
| 19. | Certifies students have met graduation requirements. | Meets Expectations | |
| 20. | Recommends faculty and staff to serve on department, campus, and collegewide committees. | Meets Expectations | |
| 21. | Works collaboratively with collegewide counterpart(s) to ensure the goals of the Instructional Division are met (if applicable). | Meets Expectations | |
| 22. | Schedules, prepares agenda for, and presides over regularly scheduled departmental meetings; distributes minutes to department members; and retains department copy. | Meets Expectations | |
| 23. | Coordinates a program with multiple sites throughout the state (if applicable). | Not Applicable | |
| 24. | Supervises off-site training and/or clinical sites and their respective Instructional Coordinators or Program Coordinators (if applicable). | Not Applicable | |

## C. DEPARTMENT PLANNING & ASSESSMENT

| | | | |
|---|---|---|---|
| 1. | Provides leadership to increase student success with graduation, progression, and retention. | Meets Expectations | |
| 2. | Coordinates, encourages, and leads department faculty in engaging in program level assessment of student learning, including implementation of recommended improvement actions. | Meets Expectations | |

2

CONFIDENTIAL

DTCC 000063

**C. DEPARTMENT PLANNING & ASSESSMENT (con't.)**

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 3. | Works collaboratively with SLOA committee to ensure the completion of the assessment process and timely submission of reports. | Meets Expectations | |
| 4. | Develops, monitors, and reports progress related to the department's annual objectives, as part of the Instructional Division's annual Campus Plan process. | Meets Expectations | |
| 5. | Integrates department goals with Campus and College goals and missions. | Meets Expectations | |
| 6. | Monitors and reports critical effectiveness indicators (i.e.: graduation rates, licensure pass rates, and job placement rates) and implements actions to improve performance. | Meets Expectations | |
| 7. | Conducts, analyzes, and makes recommendations related to the program review process. | Meets Expectations | |
| 8. | Implements department and collegewide Deans of Instruction's recommendations from program review process. | Meets Expectations | |

**D. PRINCIPAL ACCOUNTABILITIES OF INSTRUCTOR POSITION**

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Fulfills principal accountabilities of instructor position. | Meets Expectations | |

**SECTION II-SYNOPSIS OF FACULTY SURVEYS:**

N/A

**SECTION III-GOALS:** Indicate the progress which has been made in achieving the major goals which were set to be accomplished during this annual review period, and explain the progress which has been made.

Future goals established during first 6 month evaluation will be reviewed during FY19 evaluation process.

| Were goals accomplished? | ☐ YES | ☐ NO | ☒ In Progress |
|---|---|---|---|

**Explain:** The following future goals were established in August 2017. Ms. Maramante is in the process of completing and wi report progress during the next evaluation period. New/additional goals will be identified in the FY19 evaluation cycle.

**SECTION IV-Future Goals:** List those major goals which you would like to accomplish in the next year.

1) Improve laboratory safety, especially with respect to chemical hygeine by cleaning up hazardous wastes, updating the chemical hygeine plan, integrating waste management into new laboratory exercizes and setting up a cloud based chemical inventory.
2) Implement the revision of the biological sciences curriculum, including the launch of two new courses Genetics and Molecular Biology.

3

CONFIDENTIAL

DTCC_000064

3) Finish my EdD in science education
4) Use our external grant support to implement science education best practices such as integrating scientific research across the curriculum.
5) Implement any recommendation outcomes from the Food Safety Program review.
6) Develop departmental management documents to assist with budgeting, resource use, and standard operating procedures.
7) Implement at least 2 team building activities for the department.
8) Implement a Science placement test in collaboration with college-wide colleagues.

## SECTION V-EVALUATOR SUMMARY:

Ms. Maramante meets or exceeds expectations for all principal accountabilities of the department chair position within this second 6 month evaluation period. She sets high standards of excellence in the delivery of course content in the science department and strongly encourages faculty to expand knowledge in the sciences through professional development and research. She advocates for resources and is committed to establishing a safe and state of the art learning environment.

Ms. Maramante has done an outstanding job with juggling various responsibilities and completing a lot of "firsts" during her first year in the department chair role. She is encouraged to attend and complete the New Department Chair Orientation workshops within the next 6 months to gain a better understanding of collegewide processes and expectations as departmen chair.

Ms. Maramante is actively involved with various grants offered in the department and manages the budgets, resources, and reporting responsibilities to meet collegewide deadlines. Her dedication to the sciences and quality education that she emulat to her faculty and staff are second to none.

Ms.Maramante's lists of departmental responsibilities in her role as department chair are recognized by the deans. We appreciate her tireless efforts to make continual improvements in the department. We are looking forward to her continued successes and support of the department in the upcoming year.

## SECTION VI-DEPARTMENT CHAIRPERSON COMMENTS AND RESPONSES:

SIGNATURES:

I acknowledge I have read the evaluation and understand it will be placed in my personnel folder.

_____     1/30/18     _____     1/30/18
Dean of Instruction                Date          Department Chairperson                Date

4

CONFIDENTIAL

DTCC 000065

# DESCRIPTORS

| DID NOT ACHIEVE EXPECTATIONS | NEEDS SOME IMPROVEMENT | MEETS EXPECTATIONS | EXCEEDED EXPECTATIONS |
|---|---|---|---|
| Performance significantly below expectations; seriously deficient in meeting goals and objectives of specific assignments. Performance is inadequate and/or inconsistent performance, which does not meet the requirements for the position. <u>Detailed plan of specific actions to improve performance required.</u> The department chair may have difficulty improving his/her performance sufficiently to fully achieve expectations within a reasonable time. | Meets some of the areas listed under "achieves expectations" however areas of the work performance may be below the expectations for the position. It is reasonable to expect that the department chair can, with focused effort, training, and growth, bring performance up to an acceptable level within a reasonable time period. <u>Plan of specific actions to improve performance required.</u> | Consistent performance at expected levels that achieves goals and objectives of specific assignments. Work meets standard expectations and shows a clear depth and breadth of understanding of all aspects of the job. Is able to obtain cooperation and high performance from others, takes initiation in all aspects of the job. Work quality and quantity contributes in important ways to accomplish the department's, area's and/or College's goals. This rating is NOT to be used if there are performance problems or concerns. | Consistent performance at a level that significantly exceeds the performance of most other employees, often with work at the "exceptional" or "outstanding" level. Work continually exceeds standard expectations and demonstrates an accomplished understanding of all aspects of the job. The department chair is recognized by others as extremely knowledgeable in the field and clearly leads by example. Anticipates and develops critical goals in alignment with the College's strategic direction and ensures their implementation and success. |

5

B093

# DELAWARE TECHNICAL COMMUNITY COLLEGE
## DEPARTMENT CHAIRPERSON EVALUATION

RECEIVED
AUG 2 1 2018

**DEPARTMENT CHAIRPERSON:** Lori Maramante

**DEPARTMENT:** Science - August 2018

**Section I-Rate the Department Chair performance for each criterion utilizing the following descriptors.**

## A. DEPARTMENT LEADERSHIP OF FACULTY & STAFF

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Works to build a cohesive department by promoting a positive, supportive climate with good morale, cooperation, and collegiality. | Exceeds Expectation | Support faculty and staff |
| 2. | Encourages, supports, and contributes to excellence in teaching and a quality learning environment for students. | Exceeds Expectations | Support professional development that enhances instructional strategies |
| 3. | Fosters a climate of respect among students, faculty, staff, and administration. | Meets Expectations | |
| 4. | Models and fosters good communication within the department. | Meets Expectations | |
| 5. | Effectively uses problem solving skills to facilitate resolution of faculty, staff, and/or student problems within the department. | Meets Expectations | |
| 6. | Deals with stressful situations in a professional manner. | Meets Expectations | |
| 7. | Actively participates in the hiring process for new faculty and support staff and recommends final candidates for positions. | Meets Expectations | |
| 8. | Recruits, supervises, and evaluates adjunct faculty and part-time staff. | Meets Expectations | |
| 9. | Facilitates orientation for new department faculty (full and adjunct) and staff. | Meets Expectations | |
| 10. | Effectively supervises full-time faculty and support staff. | Exceeds Expectation | Provide support for faculty and staff, as well as dual enrollment offerings |
| 11. | Annually evaluates full-time faculty and support staff, providing formative feedback and guidance for personal, professional, and departmental growth. | Meets Expectations | |
| 12. | Encourages and supports the development of faculty and staff members' special talents, interests, and participation in professional meetings and activities. | Exceeds Expectation | Supported professional development for faculty |
| 13. | Coordinates departmental trainings or workshops in response to campus and collegewide initiatives and departmental needs. | Meets Expectations | |
| 14. | Effectively communicates and guides department through implementation of College policies and initiatives. | Meets Expectations | |
| 15. | Informs and supports active involvement of faculty and staff in department, campus, and college goals, activities, and initiatives. | Meets Expectations | |
| 16. | Promotes use of alternative instructional delivery strategies that meet the diverse needs of students and enhance student engagement. | Meets Expectations | |
| 17. | Promotes use of educational technology in response to collegewide initiatives to enhance the teaching-learning process. | Meets Expectations | |
| 18. | Identifies and develops individuals with potential to serve in future academic leadership roles. | Meets Expectations | |
| 19. | Assigns teaching loads equitably while balancing the needs of the Department, Campus, and College. | Meets Expectations | |

## B. DEPARTMENT ORGANIZATION & COORDINATION

| | | | |
|---|---|---|---|
| 1. | Develops and maintains a department "vision" consistent with campus and college goals to foster the Department's areas of strength. | Exceeds Expectations | Maintains standards of excellence for department |
| 2. | Builds commitment for the Department's vision by encouraging a culture of equity, respect, and collaboration | Exceeds Expectations | Department works collaboratively across campus departments as well as CW |
| 3. | Explores, develops, and makes timely and logical decisions for growth and development within the department, including new programs, instructional delivery systems, program options, and bridge programs with the Corporate and Community Programs Division. | Meets Expectations | |

1

CONFIDENTIAL

DTCC 000056

**B. DEPARTMENT ORGANIZATION & COORDINATION (con't.)**

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 4. | Develops and maintains excellence in academic programming by reviewing and modifying curriculum, course syllabi, and performance objectives in response to advisory committee recommendations and labor market needs and composes materials for appropriate college publications. | Meets Expectations | |
| 5. | Positions and represents the department in such a way as to ensure that department needs are evident and the department is acknowledged internally and externally for its contributions. | Meets Expectations | |
| 6. | Manages program accreditation/evaluation processes and prepares and submits appropriate documents in a timely manner to the Dean of Instruction for review prior to final submission. | Not Applicable | |
| 7. | Analyzes enrollment trends, room availability and, when appropriate, collaborates with other department chairs to develop and modify the department's master schedule offerings for submission to the Dean of Instruction. | Meets Expectations | |
| 8. | Recommends and participates in student recruitment as appropriate. | Meets Expectations | |
| 9. | Maintains a system of student records for students and graduates. | Meets Expectations | |
| 10. | Facilitates and supports collaboration with Student Services to meet best practices in student advisement. | Meets Expectations | |
| 11. | Coordinates and actively engages in student advisement to facilitate student success in meeting student's educational and career goals. | Meets Expectations | |
| 12. | Develops and implements articulation agreements with high schools (Tech Prep) and four-year institutions (Connected Degree). | Meets Expectations | SCI dual enrollment offerings |
| 13. | Develops and manages department budget and seeks alternative funding sources when appropriate. | Meets Expectations | |
| 14. | Seeks out and promotes opportunities for collaboration with internal and external stakeholders, which benefits the department, the faculty, and the College. | Meets Expectations | |
| 15. | Establishes and maintains an active advisory committee that provides recommendations and support for departmental growth and improvement; distributes meeting minutes and retains departmental copy. | Meets Expectations | |
| 16. | Requisitions departmental instructional texts, materials, supplies and equipment, as well as manages inventory. | Meets Expectations | |
| 17. | Recommends to the Library purchase of reference materials relevant to the department. | Meets Expectations | |
| 18. | Evaluates courses submitted for advanced standing, including credit by examination, transfer credit, prior learning, advanced placement, and tech prep. | Meets Expectations | |
| 19. | Certifies students have met graduation requirements. | Meets Expectations | |
| 20. | Recommends faculty and staff to serve on department, campus, and collegewide committees. | Meets Expectations | |
| 21. | Works collaboratively with collegewide counterpart(s) to ensure the goals of the Instructional Division are met (if applicable). | Meets Expectations | |
| 22. | Schedules, prepares agenda for, and presides over regularly scheduled departmental meetings; distributes minutes to department members, and retains department copy. | Meets Expectations | |
| 23. | Coordinates a program with multiple sites throughout the state (if applicable). | Not Applicable | |
| 24. | Supervises off-site training and/or clinical sites and their respective Instructional Coordinators or Program Coordinators (if applicable). | Not Applicable | |

**C. DEPARTMENT PLANNING & ASSESSMENT**

| | | | |
|---|---|---|---|
| 1. | Provides leadership to increase student success with graduation, progression, and retention. | Meets Expectations | |
| 2. | Coordinates, encourages, and leads department faculty in engaging in program level assessment of student learning, including implementation of recommended improvement actions. | Meets Expectations | |

2

CONFIDENTIAL

DTCC_000057

## C. DEPARTMENT PLANNING & ASSESSMENT (con't.)

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 3. | Works collaboratively with SLOA committee to ensure the completion of the assessment process and timely submission of reports. | Meets Expectations | |
| 4. | Develops, monitors, and reports progress related to the department's annual objectives, as part of the Instructional Division's annual Campus Plan process. | Meets Expectations | |
| 5. | Integrates department goals with Campus and College goals and missions. | Meets Expectations | |
| 6. | Monitors and reports critical effectiveness indicators (i.e. graduation rates, licensure pass rates, and job placement rates) and implements actions to improve performance. | Meets Expectations | |
| 7. | Conducts, analyzes, and makes recommendations related to the program review process. | Meets Expectations | |
| 8. | Implements department and collegewide Deans of Instruction's recommendations from program review process. | Not Applicable | FY 19 |

## D. PRINCIPAL ACCOUNTABILITIES OF INSTRUCTOR POSITION

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Fulfills principal accountabilities of instructor position. | Meets Expectations | |

---

**SECTION II-SYNOPSIS OF FACULTY SURVEYS:**

Faculty rated perception of overall performance as "Good to Excellent." The following comments were provided, "during Lori's 1st year as department chair, she has conducted herself professionally and in a positive light. She encourages faculty cohesiveness and allows us to be a part of department decisions." "She has been a supportive and motivating factor in putting education into research." "Lori is totally aware of our time constraints and responsibilities. During faculty meetings, she has an agenda which she follows and "gets things done. She is always thinking of new ideas to try and fosters creative thinking with the department."

---

**SECTION III-GOALS:** Indicate the progress which has been made in achieving the major goals which were set to be accomplished during this annual review period, and explain the progress which has been made.

1) Improve laboratory safety, especially with respect to chemical hygeine by cleaning up hazardous wastes, updating the chemical hygeine plan, integrating waste management into new laboratory exercizes and setting up a cloud based chemical inventory. Accomplished/In Progress. We have made MAJOR progress in this goal. CPC 581 and JTC 117 have been cleaned out and over $7000 worth of hazardous waste was removed leading to a safer student & staff environment. We have set up the web based chemical inventory and Safety Data Sheet compendium. We are evaluating inventory management/SDS alternative formats they may be more cost effective over the long run. We are piloting revisions we have made in the laboratory manuals for CHM 100 and CHM 110 with intergrated chemical hygiene/waste management. We are working with Chemtron, a waste hauler, to develop a waste management system which will meet the new "cradle to grave" waste management regulations and documentation requirements.

2) Implement the revision of the biological sciences curriculum, including the launch of two new courses, Genetics and Molecular Biology. Accomplished.

3) Finish my EdD in science education. Successfully completed doctoral defense.

4) Use our external grant support to implement science education best practices such as integrating scientific research across the curriculum. Accomplished. I have been able to direct and leverage these resources to significantly enhance our

3

CONFIDENTIAL

DTCC_000058

undergraduate curriculum in coordination with the launch of the two new programs (above). Undergraduate independent research participation grew from one to twelve students in one year and we have intergrated programatic changes to incorporate research across the Biological Sciences/Biotechnology programs.
5)Implement any recommendation outcomes from the Food Safety Program review. Supported the successful request to change the name of the Food Safety program to Food Science.
6) Develop departmental management documents to assist with budgeting, resource use, and standard operating procedures. Significant progress; ongoing effort.
7) Implement at least 2 team building activities for the department. Completed 1/2 planned activities in June 2018.
8) Implement a Science placement test in collaboration with college-wide colleagues.  In progress with college-wide counterparts.

In addition, I was the lead on a Innovation in Action Grant "Infectious Learning: Unlocking Undergraduate Potential" which was recognized at annual employee update.

| Were goals accomplished? | ☒ YES | ☐ NO | ☐ In Progress |

**Explain:**  Overall, goals were either accomplished or significant progress was made towards their achievement.

**SECTION IV-Future Goals:**  List those major goals which you would like to accomplish in the next year.

1) Continue laboratory safety initiative. Update chemical hygeine plan. Integrate chemical safety and disposal into laboratory manuals. Have staff complete annual and triennial waste management training. Continue to advocate for an emergency exit in CPC 581.
2) Create an annual preventative maintenance program for laboratory & equipment maintenance.
3) FY 19 Campus Plan, Objective 6: Leverage the use of functions in the new learning management system to enhance and support instructional delivery. (Plan for the transition to D2L learning management system.)
4) Continue programmatic development for Biological Sciences/Biotechnology, Food Science, and General Studies, including supporting undergraduate research as a best practice.
5) Continue efforts to implement a college-wide science placement test.
6) Continue to find creative ways to support faculty professional development.
7) Continue to build relationships with community employers and higher education institutions.
8) FY 19 Campus Plan, Objective 7: Enhance instructional delivery to support student success in the new academic calendar cycle.

CONFIDENTIAL

DTCC 000059

**SECTION V-EVALUATOR SUMMARY:**

Dr. Maramante has met or exceeded expectations for all principal accountabilities of the department chairperson position.

Dr. Maramante has completed her first year as department chairperson, and is commended for her high standards of excellence in delivery of course content and overall vision of the science department.  She is committed to student success and actively engages in research to expand learning opportunities while operating in a safe and state of the art learning environment.

Dr. Maramante provides excellent support and guidance to her faculty and staff. She provides her faculty opportunities for growth and leadership and support of their specific areas of interest. She is supportive of dual enrollment, and committed to ensuring these courses are taught with the same standards of excellence. Dr. Maramante works collaboratively with her CW counterparts, and the deans encourage her to continue programmatic review and development for Biological Science/Biotechnology.

The deans look forward to working with Dr. Maramante in the upcoming year to support the program.

**SECTION VI-DEPARTMENT CHAIRPERSON COMMENTS AND RESPONSES:**

**SIGNATURES:**

**I acknowledge I have read the evaluation and understand it will be placed in my personnel folder.**

_____        8/20/18        _____        8/20/18
Dean of Instruction               Date           Department Chairperson          Date

5

CONFIDENTIAL

DTCC 000060

# DESCRIPTORS

| DID NOT ACHIEVE EXPECTATIONS | NEEDS SOME IMPROVEMENT | MEETS EXPECTATIONS | EXCEEDED EXPECTATIONS |
|---|---|---|---|
| Performance significantly below expectations; seriously deficient in meeting goals and objectives of specific assignments.  Performance is inadequate and/or inconsistent performance, which does not meet the requirements for the position. Detailed plan of specific actions to improve performance required.  The department chair may have difficulty improving his/her performance sufficiently to fully achieve expectations within a reasonable time. | Meets some of the areas listed under "achieves expectations" however areas of the work performance may be below the expectations for the position. It is reasonable to expect that the department chair can, with focused effort, training, and growth, bring performance up to an acceptable level within a reasonable time period.  Plan of specific actions to improve performance required. | Consistent performance at expected levels that achieves goals and objectives of specific assignments.  Work meets standard expectations and shows a clear depth and breadth of understanding of all aspects of the job.  Is able to obtain cooperation and high performance from others, takes initiation in all aspects of the job.  Work quality and quantity contributes in important ways to accomplish the department's, area's and/or College's goals.   This rating is NOT to be used if there are performance problems or concerns. | Consistent performance at a level that significantly exceeds the performance of most other employees, often with work at the "exceptional" or "outstanding" level.  Work continually exceeds standard expectations and demonstrates an accomplished understanding of all aspects of the job. The department chair is recognized by others as extremely knowledgeable in the field and clearly leads by example.  Anticipates and develops critical goals in alignment with the College's strategic direction and ensures their implementation and success. |

6

CONFIDENTIAL

DTCC 000061

# DELAWARE TECHNICAL COMMUNITY COLLEGE
## DEPARTMENT CHAIRPERSON EVALUATION

*Reviewed JB*

SEP 0 5 2019

**DEPARTMENT CHAIRPERSON:** Dr. Lori Maramante

**DEPARTMENT:** Science - September 2019

**Section I-Rate the Department Chair performance for each criterion utilizing the following descriptors.**

## A. DEPARTMENT LEADERSHIP OF FACULTY & STAFF

| | Criterion | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Works to build a cohesive department by promoting a positive, supportive climate with good morale, cooperation, and collegiality. | Exceeds Expectation | Supporter and acts on needs of the faculty |
| 2. | Encourages, supports, and contributes to excellence in teaching and a quality learning environment for students. | Exceeds Expectations | Continually focused on quality hands-on learning (research based) |
| 3. | Fosters a climate of respect among students, faculty, staff, and administration. | Meets Expectations | |
| 4. | Models and fosters good communication within the department. | Meets Expectations | |
| 5. | Effectively uses problem solving skills to facilitate resolution of faculty, staff, and/or student problems within the department. | Meets Expectations | |
| 6. | Deals with stressful situations in a professional manner. | Meets Expectations | |
| 7. | Actively participates in the hiring process for new faculty and support staff and recommends final candidates for positions. | Meets Expectations | |
| 8. | Recruits, supervises, and evaluates adjunct faculty and part-time staff. | Meets Expectations | |
| 9. | Facilitates orientation for new department faculty (full and adjunct) and staff. | Meets Expectations | |
| 10. | Effectively supervises full-time faculty and support staff | Meets Expectations | |
| 11. | Annually evaluates full-time faculty and support staff, providing formative feedback and guidance for personal, professional, and departmental growth. | Meets Expectations | |
| 12. | Encourages and supports the development of faculty and staff members' special talents, interests, and participation in professional meetings and activities. | Exceeds Expectation | Promotes and supports professional development for faculty and staff |
| 13. | Coordinates departmental trainings or workshops in response to campus and collegewide initiatives and departmental needs. | Meets Expectations | |
| 14. | Effectively communicates and guides department through implementation of College policies and initiatives. | Meets Expectations | |
| 15. | Informs and supports active involvement of faculty and staff in department, campus, and college goals, activities, and initiatives. | Meets Expectations | |
| 16. | Promotes use of alternative instructional delivery strategies that meet the diverse needs of students and enhance student engagement. | Meets Expectations | |
| 17. | Promotes use of educational technology in response to collegewide initiatives to enhance the teaching-learning process. | Meets Expectations | |
| 18. | Identifies and develops individuals with potential to serve in future academic leadership roles. | Meets Expectations | |
| 19. | Assigns teaching loads equitably while balancing the needs of the Department, Campus, and College. | Meets Expectations | |

## B. DEPARTMENT ORGANIZATION & COORDINATION

| | Criterion | Select One | Comments |
|---|---|---|---|
| 1. | Develops and maintains a department "vision" consistent with campus and college goals to foster the Department's areas of strength. | Exceeds Expectations | Focuses on theoretical and practical knowledge, leverages industry to drive research components |
| 2. | Builds commitment for the Department's vision by encouraging a culture of equity, respect, and collaboration. | Meets Expectations | |
| 3. | Explores, develops, and makes timely and logical decisions for growth and development within the department, including new programs, instructional delivery systems, program options, and bridge programs with the Corporate and Community Programs Division. | Meets Expectations | |

1

CONFIDENTIAL DTCC 000040

**B. DEPARTMENT ORGANIZATION & COORDINATION (con't.)**

| | Select One From Each Drop Down Menu | Comments |
|---|---|---|
| 4. Develops and maintains excellence in academic programming by reviewing and modifying curriculum, course syllabi, and performance objectives in response to advisory committee recommendations and labor market needs and composes materials for appropriate college publications. | Meets Expectations | Recommend collaborating collegewide to discuss plan for BIT/BIS programs |
| 5. Positions and represents the department in such a way as to ensure that department needs are evident and the department is acknowledged internally and externally for its contributions. | Exceeds Expectations | Continued promotion and focus on undergraduate research, and grant opportunities |
| 6. Manages program accreditation/evaluation processes and prepares and submits appropriate documents in a timely manner to the Dean of Instruction for review prior to final submission. | Not Applicable | |
| 7. Analyzes enrollment trends, room availability and, when appropriate, collaborates with other department chairs to develop and modify the department's master schedule offerings for submission to the Dean of Instruction. | Meets Expectations | Needs to focus on timeliness of reporting deadlines |
| 8. Recommends and participates in student recruitment as appropriate. | Meets Expectations | |
| 9. Maintains a system of student records for students and graduates. | Meets Expectations | |
| 10. Facilitates and supports collaboration with Student Services to meet best practices in student advisement. | Meets Expectations | |
| 11. Coordinates and actively engages in student advisement to facilitate student success in meeting student's educational and career goals. | Exceeds Expectations | |
| 12. Develops and implements articulation agreements with high schools (Tech Prep) and four year institutions (Connected Degree) | Meets Expectations | Continued SCI dual enrollment offerings |
| 13. Develops and manages department budget and seeks alternative funding sources when appropriate. | Exceeds Expectations | Focus on grant and alternate funding sources; needs to focus on timeliness and submission of budget presentation |
| 14. Seeks out and promotes opportunities for collaboration with internal and external stakeholders, which benefits the department, the faculty, and the College. | Meets Expectations | |
| 15. Establishes and maintains an active advisory committee that provides recommendations and support for departmental growth and improvement; distributes meeting minutes and retains departmental copy. | Meets Expectations | |
| 16. Requisitions departmental instructional texts, materials, supplies, and equipment, as well as manages inventory. | Meets Expectations | |
| 17. Recommends to the Library purchase of reference materials relevant to the department. | Meets Expectations | |
| 18. Evaluates courses submitted for advanced standing, including credit by examination, transfer credit, prior learning, advanced placement, and tech prep. | Meets Expectations | |
| 19. Certifies students have met graduation requirements. | Meets Expectations | |
| 20. Recommends faculty and staff to serve on department, campus, and collegewide committees. | Meets Expectations | |
| 21. Works collaboratively with collegewide counterpart(s) to ensure the goals of the Instructional Division are met (if applicable). | Meets Expectations | |
| 22. Schedules, prepares agenda for, and presides over regularly scheduled departmental meetings; distributes minutes to department members, and retains department copy. | Meets Expectations | Request departmental meeting minutes be sent to OOI |
| 23. Coordinates a program with multiple sites throughout the state (if applicable). | Not Applicable | |
| 24. Supervises off-site training and/or clinical sites and their respective Instructional Coordinators or Program Coordinators (if applicable). | Not Applicable | |

**C. DEPARTMENT PLANNING & ASSESSMENT**

| | | |
|---|---|---|
| 1. Provides leadership to increase student success with graduation, progression, and retention. | Meets Expectations | |

CONFIDENTIAL

DTCC_000041

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 2. | Coordinates, encourages, and leads department faculty in engaging in program level assessment of student learning, including implementation of recommended improvement actions. | Meets Expectations | |

**C. DEPARTMENT PLANNING & ASSESSMENT (con't.)**

| | | | |
|---|---|---|---|
| 3. | Works collaboratively with SLOA committee to ensure the completion of the assessment process and timely submission of reports. | Meets Expectations | |
| 4. | Develops, monitors, and reports progress related to the department's annual objectives, as part of the Instructional Division's annual Campus Plan process. | Meets Expectations | |
| 5. | Integrates department goals with Campus and College goals and missions. | Meets Expectations | |
| 6. | Monitors and reports critical effectiveness indicators (i.e. graduation rates, licensure pass rates, and job placement rates) and implements actions to improve performance. | Meets Expectations | |
| 7. | Conducts, analyzes, and makes recommendations related to the program review process. | Not Applicable | |
| 8. | Implements department and collegewide Deans of Instruction's recommendations from program review process. | Not Applicable | |

**D. PRINCIPAL ACCOUNTABILITIES OF INSTRUCTOR POSITION**

| | | Select One From Each Drop Down Menu | Comments |
|---|---|---|---|
| 1. | Fulfills principal accountabilities of instructor position. | Meets Expectations | |

**SECTION II-SYNOPSIS OF FACULTY SURVEYS:**

Faculty completed the Faculty Perception Department Chairpersons Survey with an overall rating of "Very Good to Excellent." Comments included,"Lori always encourages open dialogue and is very open to our opinions and suggestions. She is very fair and encourages a positive environment." "Lori has created a culture of learning and improvement within the department and that has permeated our teaching causing greater teacher and student engagement. The increased student engagement has lead to more student success which subsequently lead to more student enrollment in upper level classes." "Lori has always treated me fairly and professional. If she is not on campus, she always informs us she is available via email or text. She encourages and motivates us to be the best we can be."

**SECTION III-GOALS:** Indicate the progress which has been made in achieving the major goals which were set to be accomplished during this annual review period, and explain the progress which has been made.

1) Laboratory Safety Initiative: Continue laboratory safety initiative. Update chemical hygeine plan. Integrate chemical safety and disposal into laboratory manuals. Have staff complete annual and triennial waste management training. Continue to advocate for an emergency exit in CPC 581.  Goal mostly met.

• Chemical Hygeine: We completed the cleaned out a back log of chemical wastes going back over a decade. The unscheduled, mid-semester renovation of CPC 581 required that we advance the pacing of our clean up which significantly impacted our departmental budget (unexpected expense of approximately $8,000), but our team rose to the challenge and we were able to complete the chemical clean up faster than planned. We are still working on our formal departmental Chemical Hygeine Plan.

• Staff Training: We completed a departmental waste management training for full-time chemistry faculty and staff (ASAs) and we included staff from the other campuses. Staff members completed the federally required training in: A) Hazardous Waste Management Resource Conservation and Recovery Act (RCRA) 40 CFR Part 262-265 (required annually) and

3

CONFIDENTIAL

B) Introduction to Department of Transportation, Hazardous Materials Transportation HM-126(f)–HM-181–HM-172.800 Subpart I (required triannually).

• Waste Management Plan: Under my leadership, our laboratory assistants (ASAs), have organized an integrated waste management system in consultation with our waste removal contractor, Chemtron, Inc., that meets regulatory compliance. We have also created explicit chemical waste procedures for each Chemistry Laboratory excercize for CHM 100, CHM 110. For CHM 100 and CHM 110, we have also developed power points for each laboratory for instructors to share with students which include safety guidelines and waste disposal expectations for each laboratory activity. Further, we have incorporated this information in the revised laboratory manuals. These efforts are already reducing the quantity of "unknown" wastes which lower our operating costs and make for a safer work and educational environment. Lessens learned from this process will be incorporated into our formal Chemical Hygeine Plan going forward.

• Emergency Exit in CPC 581: I continue to advocate for an emergency exit in CPC 581 and I requested funding for it in the FY20 budget.

2) Create an annual preventative maintenance program for laboratory & equipment maintenance. In the past the department has had some equipment failures because routine maintenance was not performed (e.g. $5K ice machine). This year I have worked with our laboratory ASAs to create maintence schedule and we added the needed contractual services to our operating budget. While this caused our budget request for FY20 to increase, it is a wise longterm strategy to reduce costs longterm by taking care of our equipment.
Goal met.

3) Plan for the transition to D2L learning management system.
Our same plan for transisitoning to D2L changed mid-game when CCIT announced Blackboard's decommissioning date would impact summer courses. Our department demonstrated flexibity by rising to the challenges and time constraints that this shortened timeline.
Goal In progress.

4) Continue programatic development of Biological Sciences, Biotechnology, Food Science and General Studies, including supporting undergraduate research as a best practice.

• Biological Sciences: We implemented and made refinements in the two new courses in biology: Genetics and Molecula Biology. Significantly, we also implemented some relatively small but significant changes in the chemistry courses based on a curriculum gaps analysis (e.g., how to make solutions). This years cohort of Biology/Biotechnology students was the first to benefit from those changes and we have seen a noticable improvement in the students ability to apply their chemistry skills in the biology courses. This shift is important because it reduces the need to "reteach" needed skills. We also renewed articulation agreements with the University of Delaware. Under my leadership, we have integrated undergraduate research into the Biological Sciences curriculum in a way that is unique and transformational. Our efforts in this area have been significantly aided by external grant support (NSF-ATE grant, INBRE, EPSCOR, along with funding from our own Education Foundation. We have integrated new technologies into the hands-on learning components of our courses, including gene editing with CRISPR-Cas9 and qPRC. Participation in RES courses has significantly increased.
• Biotechnology: We have worked college-wide to revise the curriculum for Biotechnology and we have submitted an updated course sequence sheet and course updates for the Biotechnology program.
• Food Science: We have begun implementation of recommendations that came out of the program review. The name change to Food Science has been significant as is opening up new opportunities for innovative articulation degrees with Delaware State University. Departmentally, we are working on strategies to support recruitment into Food Science.
• General: The Science Chairs college-wide have requested a name change for the General program to help clear up misunderstandings regarding the General major. That request is pending. We have also processed request through the curriculum committee to add courses to the major to reduce the number of petitions that need to be processed.

5) Continue efforts to implement a college-wide science placement test.
The science chairs college-wide have requested the implemenation of a chemistry placement test to assist placement of students into the correct level of chemistry with the aim of fostering student success.

6) Continue to find creative ways to support faculty professional development.
On May 9th, 2019, I led an all day team building/professional development day for the department. By all accounts, it was a huge success. I was surprised by the feedback I received because apparently many of our staff had never participated in a teambuilding workshop. Our agenda started with fun, movement based icebreaker activities, moved into cooperative activities,

CONFIDENTIAL

and then into reflection and sharing activities. From there we transitioned into goal setting and planning. Lunch, a wrap up activity and evaluations rounded out our day. I hope to make this an annual event for the department.

7) Build relationships with community employers and higher education institutions.
This year I have rebuilt and extended partnerships with Delaware State University and the University of Delaware through participating in Del Bio and EPSCOR. We are developing a working relationship with DNREC and with the local employer SPI Pharma. We continue to expand and enrich our ties with local food industry partners.
8) FY 19 Campus Plan, Objective 7: Enhance instructional delivery to support student success in the new academic calendar cycle.
We have developed and implemented the following courses in online/hybrid formats to enhance instructional delivery in support of student success: BIO 100 Essentials of Anatomy & Physiology online, BIO 120 Anatomy & Physiology I Hybrid, and BIO 121 Anatomy & Physiology II Hybrid.  These are now operational in D2L.

| Were goals accomplished? | ☒ YES | ☐ NO | ☒ In Progress |
|---|---|---|---|

**Explain:**  Goals were either accomplished or progress was made.

**SECTION IV-Future Goals:**  List those major goals which you would like to accomplish in the next year.

Departmental Overarching goals:
My overarching departmental goal for the next year are:

1) SAFETY: Continue safety efforts by: A) holding at least one formal departmental Safety Training, B) Publishing the new Chemistry 110 lab manuals with integrated safety recommendations, and 3) continuing to advocate for a second door to the CPC 581 laboratory.

2) STUDENT ADVISEMENT: Improve student advisement within the department by A) setting up and "Advisor on Call" schedule so that there is easy access to a departmental advisor for Walk In appointments; B) Add Charlene Kimmerle and Wendy Rhodes as advisors, C) Crosstrain our faculty advisors so that they have the knowledge to advise students for Biological Sciences, Biotechnology, Food Science, and General. D) Provide faculty advisors with additional training from Financial Aid to address some of the reoccuring questions.

3) EQUITY INITIATIVES: Particpate in a least one equity initiative in support of Achieving the Dream. I would like to explore the SEA Change program by the  American Association for the Advancement of Science (AAAS) to see if there upcoming departmental equity program may be a helpful in supporting our Achieving the Dream goals.

4) PLANNING FOR GROWTH & STABILITY: I foresee the need for another full-time chemistry instructor and the need for at least 6 new adjunct instructors. We are seeing growth in the Biological Sciences program and we will need to follow this trend and review the schedule to make sure we have enough higher level courses to keep students on track to graduate. The announced reduction of minimum instructional loads to 15 contact hours is likely to require additional adjuncts.

5) OPERATIONAL EFFICACY: Seek more administrative support. The additon of managing the General program has added a signicant administrative and huge advisement load to our department. Suzanne Marsh has done an excellent job as Instructional Coordinator, but much of her time (and my time) is involved in advisement of the General majors which takes away from her availablity to support the administrative needs of the department.  My counterparts have at least part-time administrative support. I have applied for a work-study for the fall to see if that may help.

5

CONFIDENTIAL

6) CHEMISTRY PLACEMENT TEST: Implement a chemistry placement test in collaboration with college-wide colleagues.

8. STUDY ABROAD COURSE: Develop a study abroad course for Introduction to Research (SCI 130) with Joe Rineer, our college-wide counterparts,  and the office of International Education.

---

1. Implement employer engagement strategies into program/department outreach to increase graduate employment rate.
2. Implement dual enrollment policies and procedures (ex: mentoring model, out reach, expansion of offerings, and alignment of practices).
3. Conduct middle and high school outreach to showcase programs.
4. Diversify adjunct pool.
5. Strengthen and improve online and/or hybrid offerings through collaboration with CCIT.

## SECTION V–EVALUATOR SUMMARY:

Dr. Maramante has met or exceeded all principal accountabilities in the department chairperson role. She has exceptional knowledge of "all things science-related" and is able to effectively communicate the work being done within the science department to a broad audience.

Dr. Maramante has increased student engagement and enrollment through implementation of undergraduate research in lab activities and through vertical alignment of course skills. Additionall, she continually seeks alternate funding sources to support the growth in the science department. Contrary, she is encouraged to ensure that we do not lose focus on the general education science requirements and support of academic programs, and ensuring the administrative responsibilties are being completed in a timely manner. She needs to be cognizant of time management and the impact that her delayed responses have on other departments and divisions (ie: budget presentations, timely responses to emails for other divisions, and follow-up with students).

Dr. Maramante is commended for her cohesiveness in the science department. Faculty feel supported and encouraged to share new and innovative ideas to participate in the process of continuously improving the science department. The deans look forward to supporting the Science department, and to working with Dr. Maramante in the upcoming academic year.

## SECTION VI–DEPARTMENT CHAIRPERSON COMMENTS AND RESPONSES:

Additonal Note:
Robert W. Stegner Award
In May 2019, I was awarded the Robert W. Stegner Award by the University of Delaware for my doctoral work in recognition of "one who demonstrates the outstanding qualities of the late Dr. Stegner: dedication to the teaching profession, comprehension of the depth and breadth of the science content area, and excellence in teaching."

CONFIDENTIAL

**SIGNATURES:**

I acknowledge I have read the evaluation and
understand it will be placed in my personnel folder.

_____  9/3/19
Dean of Instruction                Date

_____  9/3/19
Department Chairperson             Date

7

B106

CONFIDENTIAL

# DESCRIPTORS

| DID NOT ACHIEVE EXPECTATIONS | NEEDS SOME IMPROVEMENT | MEETS EXPECTATIONS | EXCEEDED EXPECTATIONS |
|---|---|---|---|
| Performance significantly below expectations; seriously deficient in meeting goals and objectives of specific assignments. Performance is inadequate and/or inconsistent performance, which does not meet the requirements for the position. <u>Detailed plan of specific actions to improve performance required.</u> The department chair may have difficulty improving his/her performance sufficiently to fully achieve expectations within a reasonable time. | Meets some of the areas listed under "achieves expectations" however areas of the work performance may be below the expectations for the position. It is reasonable to expect that the department chair can, with focused effort, training, and growth, bring performance up to an acceptable level within a reasonable time period. <u>Plan of specific actions to improve performance required.</u> | Consistent performance at expected levels that achieves goals and objectives of specific assignments. Work meets standard expectations and shows a clear depth and breadth of understanding of all aspects of the job. Is able to obtain cooperation and high performance from others, takes initiation in all aspects of the job. Work quality and quantity contributes in important ways to accomplish the department's, area's and/or College's goals. This rating is NOT to be used if there are performance problems or concerns. | Consistent performance at a level that significantly exceeds the performance of most other employees, often with work at the "exceptional" or "outstanding" level. Work continually exceeds standard expectations and demonstrates an accomplished understanding of all aspects of the job. The department chair is recognized by others as extremely knowledgeable in the field and clearly leads by example. Anticipates and develops critical goals in alignment with the College's strategic direction and ensures their implementation and success. |

8

B107

CONFIDENTIAL

DTCC 000047



# PERSONNEL POLICY MANUAL



DELAWARE
TECHNICAL ◆ COMMUNITY
COLLEGE

DELAWARE
TECHNICAL COMMUNITY
COLLEGE

Employees who, during their regular working hours, actively serve on jury duty or are under subpoena as a witness, when not a principal, shall be paid at their regular rates of pay. Appropriate documentation will be required. Employees shall return to work within a reasonable time on days released from such duty.

Any employee appearing on behalf of the College before a court, legislative committee, or judicial or quasi-judicial body will be excused with pay.

## 7.08 FAMILY AND MEDICAL LEAVE ACT

1. Purpose

In compliance with the Family and Medical Leave Act of 1993 (FMLA), the College requires eligible employees to take leave with or without pay depending on available accrued leave time for a period of up to 12 workweeks in any 12 month period for any one of the reasons listed below.  Employees on FMLA shall use available accrued sick and/or annual leave with the exception of five days annual leave and five days of sick leave.

a. For the birth and care of the employee's newborn son or daughter;

b. For the placement with the employee or employee's domestic partner of a son or daughter for adoption or foster care;

c. To care for the employee's spouse, domestic partner, parent or individual who stands or stood in loco parentis, son or daughter (including stepchild, foster child, child of an employee standing in loco parentis or child of domestic partner) who has a serious health condition; or

d. For a serious health condition (including illness or injury) that makes the employee unable to perform the essential functions of the employee's position

e. For any qualifying exigency arising out of a call or order to active duty under a provision of law referred to in section 101(a)(13)(B) of Title 10, United States Code issued to the spouse, or a son, daughter, or parent of the employee (or notification of an impending call or order to active duty) in support of a contingency operation.

The entitlement to leave for a birth or placement of a son or daughter shall expire at the end of the 12-month period beginning on the date of such birth or placement. In cases where the necessity for leave is foreseeable based on planned medical treatment, the employee shall make a reasonable effort to schedule such treatment so as not to unduly disrupt College operations.

Injuries or illness for which an eligible employee is receiving worker's compensation benefits shall not be charged to FMLA leave unless requested by the employee.

2. Service Member Family Leave

An eligible employee who is the spouse, son, daughter, parent, or next of kin of a covered service member shall be entitled to a total of 26 workweeks of leave during a 12-month period to care for the service member. The leave described in this paragraph shall only be available during a single 12-month period.

3. Combined Leave Total

During the single 12-month period described in Subsection 2, an eligible employee shall be entitled to a combined total of 26 workweeks of leave under Subsections 1 and 2. Nothing in this subsection shall be construed to limit the availability of leave under Subsection 1 during any other 12-month period.

DELAWARE
TECHNICAL & COMMUNITY
COLLEGE

4. Eligibility

In order to qualify for FMLA leave, the employee must have been employed by the State of Delaware for at least one year; and have worked at least 1,250 hours during the 12-month period immediately preceding the first day of the requested leave.

5. Procedure

When the leave is foreseeable, an employee must provide 30 calendar days advance notice by submitting a "Request for Family or Medical Leave" form to his/her supervisor for approval. When a request for service member family leave is foreseeable, or when the date of birth or placement or the date of treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

A "Certification of Health Care Provider" form must also be submitted for the reasons cited in Subsection 1.c, Subsection 1.d or Subsection 2 above. Blank "Request for Family or Medical Leave" and "Certification of Health Care Provider" forms may be obtained from the campus Human Resources Office.

Military Caregiver certification is required to support a request for leave to care for a covered family service member. A "Certification for Serious Injury or Illness of Covered Service Member" form can be obtained from the campus Human Resources Office. Exigency Leave certification is required to support a request for leave for one of the seven qualified reasons for exigency. A "Certification of Qualifying Exigency for Military Leave" form can be obtained from the campus Human Resources Office.

The request for leave shall be subject to the approval of the Vice President and Campus Director (President for employees of the Office of the President). The request for leave may be denied if the advance notice and medical certification requirements are not met.

Employee eligibility is determined, and notice of eligibility status must be provided, the first time the employee takes leave for an FMLA-qualifying reason in the employer's designated 12-month period.  The eligibility notice may be either oral and in writing and must

- Be provided within **five business days** of the initial request for leave or when the employer acquires knowledge that an employee leave may be for an FMLA-qualifying reason;
- Inform the employee of his or her eligibility status; and
- If the employee is determined to be *not* eligible for FMLA leave, state at least one reason why.

If FMLA leave is not requested by the employee and the leave exceeds 10 working days and is determined to be due to a qualifying event under the FMLA, the leave will be designated by the College as FMLA leave.

While medical certification to support a request for leave because of a serious health condition is a requisite part of the physician certification form, a second or third opinion may be required (at the College's expense).

Other detailed information relating to FMLA may be obtained from the Human Resources Office.

6. Period of Leave

An eligible employee may take up to 12 workweeks leave during an FMLA 12-month eligibility period (or 26 weeks in a case involving Service Member Family Leave). The FMLA 12-month eligibility period means

DELAWARE
TECHNICAL ◆ COMMUNITY
COLLEGE

the 12-month period measured forward from the date an employee first takes FMLA leave. After a 12-month period following the completion of an FMLA leave, an employee is eligible for another FMLA leave.

7. Benefits Which are Continued During Paid FMLA Leave

While on paid FMLA leave, the employee will continue to accrue annual leave and sick leave, and the employee is entitled to have his/her existing College health and life insurance benefits maintained (including any State of Delaware share of the monthly cost). For full-time employees this includes: health insurance, Blood Bank, vision, dental, and life insurance under the College's Flexible Benefits Plan. If an employee was paying all or part of the premium payments prior to leave, the employee would continue to pay that amount during the leave period. Employees should forward payments for their share to: Human Resources and Legal Affairs Department, Office of the President, P.O. Box 897, Dover, DE 19903. Failure by the employee to make his/her share of such contribution within 30 days after the payment due date will result in termination of coverage.

8. Benefits Which are Discontinued During Unpaid FMLA Leave

Holiday pay, annual leave, and sick leave are not earned during unpaid FMLA leave. Other benefits which are discontinued during unpaid FMLA leave are: disability insurance, Worker's Compensation, Unemployment Insurance, as well as contributions to the State of Delaware Pension Plan and Social Security, by both the State and the employee.

9. Intermittent or Part-time FMLA Leave

An eligible employee may take FMLA leave on an intermittent or part-time basis rather than all at once.

In order to accommodate FMLA leave on an intermittent or part-time basis, the Vice President and Campus Director may temporarily alter an existing position or transfer an employee to an alternative position with equivalent pay and benefits.

11. Return to Work After FMLA Leave

In the event that an employee does not return to work or works for less than 30 calendar days upon the expiration of an FMLA leave or approved extension of leave, the College's share of benefits premium payments shall be recovered from the employee for any period of unpaid leave except for the following circumstances: the serious health condition of the employee or the employee's spouse, son, daughter, parent or service member being cared for by the employee; or another reason beyond the employee's control. An employee who is unable to return to work due to the continuation, recurrence, or onset of a serious health condition that entitles the employee to FMLA leave shall be required to provide a certification issued by the health care provider for the employee or the qualifying family or service member, as the case may be.

Other provisions regarding return to work after FMLA leave may be found in RETURN TO WORK UPON TERMINATION OF LEAVE, 7.13 of this Section.
(Amended Board of Trustees, 6/15/1999; 6/2/2009; 11/11/14)

## 7.09 PROFESSIONAL AND PUBLIC SERVICE LEAVES OF ABSENCE

Professional and public service leaves of absence, of whatever duration, with or without pay, requested by an employee in accordance with the provisions of this manual will be approved only if the appropriate Vice President and Campus Director (or President for Office of the President), in his/her sole and absolute discretion, determines that such leave would be beneficial to the College. In making a decision to grant or deny a request for such a leave of absence, the foremost consideration of the Vice President and Campus

DELAWARE
TECHNICAL ✦ COMMUNITY
COLLEGE

The College can assume no responsibility for the private services rendered by members of its staff. The staff member should make it clear to those by whom he/she is employed that such services have no official connection with the College. Additionally, Delaware Tech employees are not to use the Delaware Technical Community College name in conjunction with his/her name when teaching for another educational institution or any other outside employer. In the interest of sound administrative practice, supervisors should be aware of the professional activities of their staff.

## 11.12 EVALUATIONS

All employees shall have their performance observed and evaluated by department chairpersons, supervisors and/or administrators. The purpose of the evaluation is to determine performance. A written evaluation, based upon performance criteria, shall be completed semi-annually during the first year of employment and during the first year in a position to which the employee has been promoted or transferred, and annually in each subsequent year. The annual performance appraisal period shall be between May 1 and September 30 of each fiscal year. The designated supervisor shall discuss, in conference, with the individual the written evaluation which shall be signed by both the employee and the supervisor. The employee shall be given a copy, and a copy shall be submitted to the appropriate administrator. The original copy shall be filed at the campus in the employee's personnel file.

If the employee disagrees with the evaluation, such disagreement should be noted by the employee at the time he/she signs the evaluation. The employee should express to the supervisor and the Vice President and Campus Director, in writing, the reasons for the disagreement.

Inasmuch as evaluations are intended to commend good performance and/or note performance deficiencies, those preparing evaluations should always attempt to be objective, candid, and fair in their appraisal of a subordinate's performance.

## 11.13 ELECTRONIC COMMUNICATION DEVICE USE POLICY

This policy is implemented in order to maintain a productive, safe work environment and applies to both incoming and outgoing communications.

Cell phones and other electronic communication devices shall be turned off or set to silent or vibrate mode during meetings, conferences, and in classrooms or other locations where incoming calls may disrupt normal workflow.

Employees may use personal cell phones or electronic communication devices while at work on a sporadic basis and only for periods of short duration. If employee use of a personal cell phone or electronic communication device causes disruptions or loss in customer service or productivity, the employee may be subject to disciplinary action.

Due to safety reasons, the use of a cell phone or electric communication device(s) while driving a State vehicle is strongly discouraged.

The College strictly prohibits the use of camera phones and other recording devices in any manner which violates or compromises norms of personal conduct or the expectation of privacy that individuals have a reasonable right to expect. (Added Board of Trustees, 4/3/07)

# Conduct and Corrective or Disciplinary Action Policy

## 12.01 CONDUCT AND CORRECTIVE OR DISCIPLINARY ACTIONS